PRESENT: All the Justices

TRAVION BLOUNT

|  | OPINION BY |
| v. Record No. 151017 | JUSTICE CLEO E. POWELL |
|  | FEBRUARY 12, 2016 |

HAROLD W. CLARKE, DIRECTOR
OF THE VIRGINIA DEPARTMENT
OF CORRECTIONS


UPON QUESTIONS OF LAW CERTIFIED BY THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA


Pursuant to Article VI, Section 1 of the Constitution of Virginia, we accepted the following certified questions from the United States District Court for the Eastern District of Virginia, restated for the ease of presentation, pursuant to Rule 5:40(d):

(1) Is the document which emanated from the Executive Department [on January 10, 2014 and signed by then-Governor Robert F. McDonnell] to be considered [(a)] a . . . pardon or [(b)] a commutation?

(2) Were the actions taken by the Governor of Virginia in [the aforementioned document] valid under the Virginia State Constitution?

(Letter designators and alterations added).[1]

I. Background

---

[1] Pursuant to Rule 5:40(d), we may restate a certified question as originally posed, when doing so will aid in "produc[ing] a determinative answer in the[] proceedings." VanBuren v. Grubb, 284 Va. 584, 589, 733 S.E.2d 919, 921 (2012). As originally stated, both certified questions refer to a document appended to the District Court's certification order and designated only as "Attachment A." See Blount v. Clarke, Dir. of the Va. Dep't of Corr., Civil Action No. 2:12cv699, slip op. at 3 (E.D. Va. July 1, 2015). We have restated the certified questions to clarify that these references are to the January 10, 2014 executive order signed by then-Governor Robert F. McDonnell and have deleted the qualifier "conditional" before the word "pardon" to aid in producing a determinative answer.

1

In September 2006, then-fifteen-year-old Travion Blount participated with Morris Downing and David Nichols, both adults, in the armed robbery of numerous attendees of a house party in Norfolk, Virginia. Blount was indicted on 51 felony charges stemming from the robbery. Downing entered a guilty plea and was sentenced under a plea bargain to 10 years. Nichols similarly pleaded guilty and was sentenced to 13 years. Blount pleaded not guilty.

On March 12, 2008, the Circuit Court for the City of Norfolk ("trial court") found Blount guilty of 49 counts, including multiple robbery, attempted robbery, conspiracy to commit robbery, abduction, and firearm charges. Blount was sentenced to 118 mandatory years in prison for 24 firearm convictions and to six consecutive life terms for three abduction convictions and three robbery convictions. Blount unsuccessfully appealed his convictions to the Court of Appeals of Virginia and to this Court.

The United States Supreme Court later ruled in Graham v. Florida, 560 U.S. 48, 82 (2010), that "[t]he Constitution prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide" without offering a meaningful opportunity for release. Blount's habeas petition and subsequent habeas appeals were refused, with our courts relying upon Angel v. Commonwealth, 281 Va. 248, 273-75, 704 S.E.2d 386, 401-02 (2011), in holding that Code § 53.1-40.01, which permits inmates to apply for conditional release at age sixty, provides "an appropriate mechanism" for compliance with Graham.

On December 21, 2012, Blount filed a "Petition for Habeas Corpus By Prisoner In State Custody" pursuant to 28 U.S.C. § 2254 ("federal habeas petition") in the United States District Court for the Eastern District of Virginia ("the District Court"), contending that his six life sentences without parole for the non-homicide offenses he had committed as a juvenile were unconstitutional under Graham and that this Court incorrectly held in Angel that Code § 53.1-

2

40.01 offered him a meaningful opportunity for release in his lifetime. The District Court denied the Commonwealth's motion to dismiss Blount's federal habeas petition. While discovery was pending in the District Court, Blount's counsel filed a request for a conditional pardon with the Governor's office on December 30, 2013. In his letter, Blount requested that then-Governor McDonnell grant him a conditional pardon of his six life sentences and 118-year sentence and modify his term of imprisonment "to a more appropriate amount of time for the crimes he committed, which many believe might be somewhere between ten and twenty years' incarceration."

On January 10, 2014, Governor McDonnell issued an executive order stating:

> NOW THEREFORE, in light of the record before me and in the interest of justice based on Blount's young age at the time of the crime, his multi-life sentences compared to the sentences of his older co-conspirators without the possibility of parole, and in light of his complete criminal history and conduct while incarcerated in accordance with the provisions of the powers granted to me under Article V, Section 12 of the Constitution of Virginia, I Robert F. McDonnell, do hereby immediately grant Travion Blount, a COMMUTATION OF SENTENCE, reducing his term of incarceration for a total of forty (40) years for his offenses.

> \* \* \* \*

> Pardon granted: January 10, 2014

On January 15, 2014, the Commonwealth filed a "Notice of Pardon" with the District Court and thereafter contended that the Governor's "commutation" of Blount's sentence made Blount's petition for habeas corpus moot. In response, Blount filed a supplemental motion for a continuance, claiming that the Governor's executive order may be construed only as a "conditional pardon" because the Governor has no power to commute non-capital offenses under Article V, Section 12 of the Constitution of Virginia as this Court construed that provision in Lee v. Murphy, 63 Va. (22 Gratt.) 789 (1872).

3

The District Court entered an Order on August 6, 2014 granting Blount's motion to continue and ordering further discovery, holding that the Governor did not have the authority to commute a non-capital offense as argued by Blount. In response, the Commonwealth filed a motion for reconsideration claiming that the District Court did not have the authority to decide this question of state constitutional law, that Lee was wrongly decided, and that, as a matter of practice for the past 143 years, the Governors of the Commonwealth have regularly exercised their power to commute non-capital offenses without contest.

## II. ANALYSIS

### A. Certified Question (1)

#### 1. Executive Clemency in Virginia

Article V, Section 12 of the Constitution of Virginia provides:

> The Governor shall have power to remit fines and penalties under such rules and regulations as may be prescribed by law; to grant reprieves and pardons after conviction except when the prosecution has been carried on by the House of Delegates; to remove political disabilities consequent upon conviction for offenses committed prior or subsequent to the adoption of this Constitution; and to commute capital punishment.
>
> He shall communicate to the General Assembly, at each regular session, particulars of every case of fine or penalty remitted, of reprieve or pardon granted, and of punishment commuted, with his reasons for remitting, granting, or commuting the same.

In construing constitutional provisions, the Court is "not permitted to speculate on what the framers of [a] section might have meant to say, but are, of necessity, controlled by what they did say." Harrison v. Day, 200 Va. 439, 448, 106 S.E.2d 636, 644 (1959). If there are "no doubtful or ambiguous words or terms used, we are limited to the language of the section itself and are not at liberty to search for meaning, intent or purpose beyond the instrument." Id.

4

> "Constitutions are not esoteric documents and recondite learning ought to be unnecessary when we come to interpret provisions apparently plain. They speak for the people in convention assembled, and must be obeyed.
>
> It is a general rule that the words of a Constitution are to be understood in the sense in which they are popularly employed, unless the context or the very nature of the subject indicates otherwise."

Lipscomb v. Nuckols, 161 Va. 936, 945, 172 S.E.2d 886, 889 (1934) (internal quotation marks and citation omitted) (quoting Quesinberry v. Hull, 159 Va. 270, 274, 165 S.E. 382, 383 (1932)).

The words of Article V, Section 12 are unambiguous. Pursuant to its language, the Governor is vested with the power to (1) grant reprieves; (2) grant pardons; and (3) commute capital punishment. Nothing in the plain language of the Constitution purports to give the Governor power to commute sentences imposed for convictions on non-capital offenses. However, a brief review of the history surrounding the terms "pardon" and "commutation" is necessary to answer the certified questions propounded by the District Court.

### 2. Pardon

> A pardon may be full or partial, absolute or conditional. In some of the States this is so by the express words of the constitution; and where the words are not express, the same result flows from the doctrine that with us a power general in its terms takes the construction given it in the English common law, whence our law is derived.

Lee, 63 Va. (22 Gratt.) at 794.

A pardon is defined as "[t]he act or an instance of officially nullifying punishment or other legal consequences of a crime." Black's Law Dictionary at 1286 (10th Ed. 2014). A conditional pardon is "[a] pardon that does not become effective until the wrongdoer satisfies a prerequisite or that will be revoked upon the occurrence of some specified act." Id. A partial

5

pardon is "[a] pardon that exonerates the offender from some but not all of the punishment or

legal consequences of a crime." Id.

> A pardon in our days is not a private act of grace from an
> individual happening to possess power. It is a part of the
> Constitutional scheme. When granted it is the determination of the
> ultimate authority that the public welfare will be better served by
> inflicting less than what the judgment fixed. See Ex parte
> Grossman, 267 U.S. 87, 120, 121 [(1925)]. Just as the original
> punishment would be imposed without regard to the prisoner's
> consent and in the teeth of his will, whether he liked it or not, the
> public welfare, not his consent, determines what shall be done. So
> far as a pardon legitimately cuts down a penalty, it affects the
> judgment imposing it. No one doubts that a reduction of the term
> of an imprisonment or the amount of a fine would limit the
> sentence effectively on the one side and on the other would leave
> the reduced term or fine valid and to be enforced, and that the
> convict's consent is not required.

Biddle v. Perovich, 274 U.S. 480, 486-87 (1927).

### 3. Commutation

A commutation is defined as "1. An exchange or replacement. 2. *Criminal law*. The

executive's substitution in a particular case of a less severe punishment for a more severe one

that has already been judicially imposed on the defendant." Black's Law Dictionary at 339.

When the General Assembly adopted the proposed and ratified Constitution of 1851, the term

"commutation" signified a change or substitution "in kind" of punishment, a substitution of a

"lesser" form for a "greater" form. Thus, a reduction in the term of imprisonment at that time

would not have been understood as a "commutation," but only a "partial pardon," because it did

not concern a change in the kind of punishment.

Initially, the Executive Committee recommended imbuing the Governor with the power

to "commute the punishment" generally. Register of the Debates and Proceedings of the Va.

Reform Convention 71-72 (1851). Subsequently, the word "capital" was inserted to modify

punishment, along with the clause requiring the Governor to communicate the "particulars of

6

every case of fine or penalty remitted, of reprieve or pardon granted, and of punishment

commuted." Debates and Proceedings of the Va. Reform Convention, Supplement. No. 82-1,

Richmond Enquirer (July 14, 1851) (on file at the Library of Virginia).

Then, during the debate on the provision at issue, Delegate Stanard spoke in opposition to

giving the Governor the power "to commute capital punishment." In his speech he articulates an

understanding that a commutation is a change in the kind of punishment and is distinct from a

pardon.

> It ought not to be left to the executive to say that he shall not be
> pardoned and that he shall be punished, not in the mode prescribed
> by law for a crime of which he has been guilty, but by some other
> mode which the executive may think more proper to be applied.

Debates and Proceedings of the Va. Reform Convention, Supp. No 82-2, Richmond Enquirer

(July 15, 1851) (on file at the Library of Virginia) (emphasis added).

Delegate Stanard's understanding of the term "commutation" as a change in the kind of

punishment finds support from Justice McLean in Ex parte Wells, 59 U.S. 307, 319-20 (1856)

(McLean, J., dissenting). In dissent, Justice McLean distinguished between the power to pardon

and the power to commute while explaining why the executive order at issue was actually an

unauthorized commutation, not a conditional pardon. Justice McLean wrote regarding the power

to pardon:

> I have no doubt the President, under the power to pardon, may
> remit the penalty in part, but this consists in shortening the time of
> imprisonment, or reducing the amount of the fine, or in releasing
> entirely from the one or the other. This acts directly upon the
> sentence of the court, under the law, and is strictly an exercise of
> the pardoning power in lessening the degree of punishment . . . .

Id. at 319-20. In contrast,

> [t]he power of commutation overrides the law and the judgments
> of courts. It substitutes a new . . . punishment for that which the

7

> law prescribes a specific penalty.  It is, in fact, a suspension of the law, and substituting <u>some other punishment</u> which, to the executive, may seem to be more reasonable and proper.

<u>Id.</u> at 319 (emphasis added).  Clearly, they were distinguishing commutations from partial pardons, supporting the proposition that the two are separate and independent, though closely related, acts of clemency.  One lessens the punishment by degrees (partial pardon) the other changes the kind of punishment from death to life imprisonment (commutation).

Other states addressing the issue in the timeframe of our constitutional amendment recognized a similar distinction between pardons and commutations.  <u>See</u> <u>Ogletree v. Dozier</u>, 59 Ga. 800, 802 (1877) ("In its legal sense, to commute would mean to change from a higher to a lower punishment — to change a penalty from the hard work of a chain-gang to work on a farm, for instance . . . ."); <u>People ex rel. Smith v. Jenkins</u>, 156 N.E. 290, 292 (Ill. 1927) ("[Commutation] is defined in Bouvier's Law Dictionary as 'the change of a punishment to which a person has been condemned into a less severe one,' and in Anderson's Law Dictionary as 'the substitution of a less for a greater penalty or punishment; the change of the punishment for another and different punishment, both being known to the law.'"); <u>Rich v. Chamberlain</u>, 65 N.W. 235, 235 (Mich. 1895) (citations omitted) ("To commute is defined: 'to exchange one penalty or punishment for another, less severe. . . . [t]he change of a punishment to which a person has been condemned into a less severe one.'"); <u>Ex parte Parker</u>, 17 S.W. 658, 660 (Mo. 1891) ("Commutation is defined . . . to be 'the change of punishment to which a person has been condemned into a less severe one.'"); <u>Ex parte William Janes</u>, 1 Nev. 319, 321 (1865) ("A commutation is the change of one punishment known to the law for another and different punishment also known to the law."); <u>State v. Hildebrand</u>, 95 A.2d 488, 489 (N.J. Super. 1953) ("This constitutional grant of the pardoning power carried with it the lesser powers of granting

8

remission of part of the penalty, of granting commutation of sentence, and of granting a limited or partial pardon, although none of these lesser powers is specifically mentioned."); State ex rel. Attorney-General v. Peters, 4 N.E. 81 (Ohio 1885) (citation omitted) ("A pardon discharges the individual designated from all or some specified penal consequences of his crime.  It may be full or partial, absolute or conditional. . . .  [C]ommutation is 'the change of a punishment to which a person has been condemned into a less severe one.'").

4.  The January 10, 2014 Executive Order

"It is well settled that no technical words or terms are necessary to constitute a pardon." Lee, 63 Va. (22 Gratt.) at 799.  Here, because the Governor's order does not purport to change the kind of punishment, but rather it changes the degree or length of Blount's incarceration, it is a partial pardon and not a commutation.  Blount argues that because the executive order says "COMMUTATION OF SENTENCE" the Governor's actions were invalid because the Governor is only vested with the power to issue commutations in capital cases.  Blount further asserts at most that the Executive Order is only valid as a conditional pardon, which he does not accept. We disagree with Blount's assertions for two reasons.

Blount is correct that the executive order says "COMMUTATION OF SENTENCE." However, as recognized in Lee, the courts should operate to "effectuate rather than defeat the intention of the State."  Id. at 801.  Lee also recognized that the same interpretation of the law as applied to acts of the king should apply to that of the Governor:

> if the king's grant admits of two interpretations, one of which will make it utterly void and worthless, and the other will give it a reasonable effect, then the latter is to prevail, for the reason, says the common law, that it will be more for the benefit of the subject and the honor of the king; which is more to be regarded than his profit.
>
> And the same rule should be held to apply to the grants of a State.

9

Id. (citation omitted).

We also disagree with Blount's contention that if not invalid as a commutation of a noncapital crime, the executive order is a conditional pardon. Blount argues as if there are only two alternatives, either a commutation or a conditional pardon. As was the case in Wells, the question here is not one of practice or even a habitual mislabeling of an act, rather it is purely one of constitutional interpretation. See Ex parte Wells, 59 U.S. at 309. The Constitution does not restrict pardons to conditional pardons. However, there are various kinds of pardons.

> "[A] pardon may be full or partial, absolute or conditional. A pardon is full when it freely and unconditionally absolves the person from all the legal consequences of a crime and of the person's conviction, direct and collateral, including the punishment, whether of imprisonment, pecuniary penalty, or whatever else the law has provided; it is partial where it remits only a portion of the punishment or absolves from only a portion of the legal consequences of the crime. A pardon is absolute where it frees the criminal without any condition whatsoever; and it is conditional where it does not become operative until the grantee has performed some specified act, or where it becomes void when some specified event transpires."

People ex rel. Madigan v. Snyder, 804 N.E.2d 546, 557 (Ill. 2004) (quoting 67A C.J.S. Pardon & Parole § 2, at 6 (2002)). These distinctions have been acknowledged both in Lee, 63 Va. (22 Gratt.) at 794 (observing that "[a] pardon may be full or partial, absolute or conditional"), and in Ex parte Wells, 59 U.S. at 310 ("[E]very pardon has its particular denomination. They are general, special, or particular, conditional or absolute, [or] statutory.").

Here, Blount requested that the Governor grant him a conditional pardon. Governor McDonnell did not attach any conditions to the reduction in the degree of punishment for Blount. Because there were no conditions attached to the pardon and Governor McDonnell did not include anything that would signal the need for Blount's consent (unlike the Governor in Lee, who included a signature line for the defendant's consent), Blount did not receive a conditional

10

pardon. Blount also did not receive a commutation. As we stated above, the Governor is only vested with the power to commute capital punishment. Also, the reduction to Blount's punishment was in degree, not in kind.[2] That is a distinction that was recognized at the time the Constitution was amended.

Accordingly, we hold that the answer to certified question (1) is that the executive order from Governor McDonnell constitutes a partial pardon because it exonerated him from some but not all of the punishment for his crimes. As the executive order is a partial pardon, it is self-executing, and its efficacy does not depend on whether Blount would accept it or reject it.

### B. Certified Question (2)

Because we find that the executive order from Governor McDonnell constitutes a partial pardon, we answer certified question (2) in the affirmative. The Commonwealth concedes on brief that the Governor has the power to issue a conditional pardon or a partial pardon as those are lesser powers subsumed within the general pardoning power granted by Article V, Section 12 of the Constitution of Virginia. As we have previously held, "[a] pardon may be full or partial, absolute or conditional." Lee, 63 Va. (22 Gratt.) at 794.

### III. CONCLUSION

For the reasons stated above, certified question (1), alternative (a) is answered in the affirmative, as the executive order constitutes a partial pardon. Certified question (2) is likewise answered in the affirmative.

Certified question (1), alternative (a) answered in the affirmative.

Certified question (2) answered in the affirmative.

---

[2] In Lee, the executive order purported to change the sentence from imprisonment in the penitentiary to imprisonment in the city jail — a change in the form of imprisonment.

11

JUSTICE KELSEY, with whom JUSTICE McCLANAHAN and JUSTICE ROUSH join, dissenting.

Our opinion in Lee v. Murphy, 63 Va. (22 Gratt.) 789 (1872), has been on the books for over a century. Applying Lee to this case, I would hold that Governor Robert F. McDonnell issued exactly what he said he issued — a commutation of the criminal sentences imposed on Travion Blount. We could judicially construe it to be a conditional pardon, as we did in Lee, but that would require Blount's acceptance, something he has steadfastly refused to give. Without Blount's assent, the Governor's act of clemency has no legal effect because the Constitution of Virginia does not authorize non-consensual commutations of noncapital sentences.

I.

In 2013, while his federal habeas case was pending, Blount requested that then-Governor McDonnell "commute" his sentences to a lesser period of incarceration. J.A. at 35. Blount acknowledged that the power to do so depended upon the characterization of his request as a "conditional pardon." Id. at 27, 32, 35, 36. On January 10, 2014, Governor McDonnell issued an executive order. The order stated that Blount had requested a "conditional pardon." Id. at 38. The Governor granted it as follows:

> NOW THEREFORE, in light of the record before me and in the interest of justice based on Blount's young age at the time of the crime, his multi-life sentences compared to the sentences of his older co-conspirators without the possibility of parole, and in light of his complete criminal history and conduct while incarcerated in accordance with the provisions of the powers granted to me under Article V, Section 12 of the Constitution of Virginia, I, Robert F. McDonnell, do hereby immediately grant Travion T. Blount, a COMMUTATION OF SENTENCE, reducing his term of incarceration for a total of forty (40) years for his offenses.
>
> . . . .
>
> Pardon granted: January 10, 2014

12

On January 15, 2014, the Commonwealth filed a "Notice of Pardon" with the United States District Court, which stated that the Governor "pardoned" Blount and "commuted" his prior sentences. Id. at 40. Also included was an affidavit from an official with the Virginia Department of Corrections affirming that she had received the "Commutation" from the Governor that had "commuted" Blount's sentences. Id. at 43.

The Commonwealth argued that the Governor's clemency rendered moot Blount's federal petition for habeas corpus. In response, Blount claimed that the Governor's executive order may be construed only as a conditional pardon because the Governor has no power to commute noncapital offenses under Article V, Section 12 of the Constitution of Virginia as this Court construed that provision in Lee. The federal habeas petition was not moot, Blount argued, because his pardon was conditioned upon his acceptance — which he refused to give.

The United States District Court certified two questions to us concerning the legal nature and validity of the executive clemency offered to Blount. The first question asks whether the "document" issued by Governor McDonnell to Blount was a "conditional pardon" or a "commutation." J.A. at 103. The second question asks if it was legally valid under the Constitution of Virginia. See id.[1] On these issues, both the Commonwealth and Blount have advocated with clarity and precision. The majority, however, rejects both parties' arguments and adopts a novel theory not advanced by either party. In short, the majority holds that commutations of noncapital offenses violate the Constitution of Virginia (as Lee held), but,

---

[1] Rule 5:40(d) authorizes us to restate a certified question as originally posed, when doing so will aid in producing a "determinative answer" in the proceedings. VanBuren v. Grubb, 284 Va. 584, 589, 733 S.E.2d 919, 921 (2012). The majority uses that authority to excise the word "conditional" from the District Court's first certified question, which originally asked whether Governor McDonnell's act of clemency should be considered a "conditional pardon" or a "commutation." Ante at 1 & n.1. The excision of that one word summarizes the majority's entire opinion and lays bare its principal conceptual flaw.

13

regardless, Governor McDonnell did not issue a commutation to Blount — indeed, he could not have done so, because commutations by definition do not include a mere reduction in a convict's term of incarceration. Because I know of no legal precedent supporting that view, I respectfully dissent.

## II.

### A. ABSOLUTE & CONDITIONAL PARDONS

The executive power of clemency "reveals a consistent pattern of adherence to the English common-law practice." Schick v. Reed, 419 U.S. 256, 262 (1974); see also Lee, 63 Va. (22 Gratt.) at 791-92. Historically, Anglo-American common law has included several related, but conceptually distinct, subsets of executive clemency.

Early precedents described an absolute pardon as reaching "both the punishment prescribed for the offence and the guilt of the offender; and when the pardon is full, it releases the punishment and blots out of existence the guilt, so that in the eye of the law the offender is as innocent as if he had never committed the offence." Ex parte Garland, 71 U.S. 333, 380 (1867).[2] In this respect, an absolute pardon constituted a "complete remission of any legal consequences emanating from a particular crime," Stanley Grupp, Some Historical Aspects of the Pardon in England, 7 Am. J. Legal Hist. 51 (1963), and restored "the competency of the offender and remove[d] the infamy of the conviction," Lee, 63 Va. (22 Gratt.) at 799.[3] This principle tracked the common-law view that "the effect of such pardon by the king [was] to make the offender a

---

[2] An "absolute pardon" must be distinguished from a "simple pardon," which "forgives the legal violation, but does not erase the individual's criminal record; nor does it restore his civil rights unless such relief is specifically given in the pardoning document." Walter A. McFarlane, The Clemency Process in Virginia, 27 U. Rich. L. Rev. 241, 246 (1993).

[3] "There is only this limitation to its operation: it does not restore offices forfeited, or property or interests vested in others in consequence of the conviction and judgment." Ex parte Garland, 71 U.S. at 381.

14

new man" and "to acquit him of all corporal penalties and forfeitures annexed to that offence for which he obtain[ed] his pardon." 4 William Blackstone, Commentaries *402. Compare Edwards v. Commonwealth, 78 Va. 39, 41-42 (1883), with Prichard v. Battle, 178 Va. 455, 465-66, 17 S.E.2d 393, 397 (1941).

A conditional pardon required the satisfaction of a condition "whether precedent or subsequent" upon "the performance whereof the validity of the pardon will depend." 2 William Hawkins, A Treatise of the Pleas of the Crown § 45, at 547 (8th ed. 1824); see also 4 Blackstone, supra, at *401; 1 Joseph Chitty, A Practical Treatise on the Criminal Law 533 (1819). A pardon is subject to a condition precedent "if by its terms some event is to transpire before it takes effect," and the pardon's "operation is deferred until the event occurs." 1 Joel P. Bishop, New Commentaries on the Criminal Law § 914, at 555 (8th ed. 1892). "If the condition is subsequent, the pardon goes into operation immediately, yet becomes void whenever the condition is broken." Id.

There is high authority for the proposition that all pardons, absolute or conditional, required the assent of the convict. 1 Bishop, supra, § 907, at 550. As Chief Justice John Marshall explained:

> A pardon is a deed, to the validity of which delivery is essential, and delivery is not complete without acceptance. It may then be rejected by the person to whom it is tendered; and if it be rejected, we have discovered no power in a court to force it on him.
>
> It may be supposed that no being condemned to death would reject a pardon; but the rule must be the same in capital cases and in misdemeanours. A pardon may be conditional; and the condition may be more objectionable than the punishment inflicted by the judgment.

United States v. Wilson, 32 U.S. 150, 161 (1833); see also Burdick v. United States, 236 U.S. 79, 90-91 (1915). Chief Justice Marshall's maxim held sway until another titan of the law, Justice

15

Oliver Wendell Holmes, Jr., rejected it in <u>Biddle v. Perovich</u>, 274 U.S. 480, 486-87 (1927).

We have never been put to the unenviable task of trying to choose between the views of these two great jurists on the question of whether pardons generally (both conditional and unconditional) must be accepted by the convict to be effective. But in <u>Lee</u> we made clear our agreement with Chief Justice Marshall's consent requirement on the effectiveness of conditional pardons: "A conditional pardon is a grant, to the validity of which acceptance is essential. It may be rejected by the convict; and if rejected, there is no power to force it upon him." <u>Lee</u>, 63 Va. (22 Gratt.) at 798.[4]

### B. COMMUTATIONS: LESSENING A LAWFUL PUNISHMENT

A pardon should be distinguished from a mere commutation. "A commutation is the substitution of a *less* for a *greater* punishment, *by authority of law*," <u>Lee</u>, 63 Va. (22 Gratt.) at 798 (emphasis added), or "a change of punishment from a *higher to a lower degree*, in the scale of crimes and penalties *fixed by the law*," <u>In re Victor</u>, 31 Ohio St. 206, 207 (1877) (emphasis added). In other words, a commutation is a "change of a punishment to which a person has been condemned into a less severe one," 1 John Bouvier, A Law Dictionary 258 (5th ed. 1854), accomplished by substituting "a smaller for a greater punishment," Willard H. Humbert, The Pardoning Power of the President 27 (1941).

---

[4] As applied to conditional pardons, these consent principles likely developed in response to the concern that "[a]buses of the pardoning power in England as elsewhere have existed since the earliest times." Grupp, <u>supra</u>, at 58. Conditional pardons were issued by English kings to recruit soldiers for war, 1 Luke Owen Pike, History of Crime in England 294-95 (1873), to banish criminals to colonies and plantations in America, 11 William Holdsworth, A History of English Law 570 (1938), to force criminals into periods of hard labor, <u>Schick</u>, 419 U.S. at 261 n.3 (citing 4 Blackstone, <u>supra</u>, at *401), and even to extort money from criminals by cash-strapped monarchs using the pardon as "a means of financial exploitation," Grupp, <u>supra</u>, at 59 (citing 1 F. W. Maitland, Select Pleas of the Crown 85-86 (1888)).

We have adopted the traditional definition of commutations. "Commutation is simple," we have said, because it is nothing more than "the substitution of a less for a greater penalty or punishment." Lee, 63 Va. (22 Gratt.) at 799. It applies when "the original punishment is remitted, and a milder sentence is substituted." Id. As the Attorney General of Virginia correctly opined over a half-century ago:

> I am in receipt of your letter . . . asking for the authority of the Governor to commute a life sentence to a term of years.
>
> Under constitutional provisions substantially similar to those now in existence, the [Supreme] Court of Appeals had this question before it in Lee v. Murphy, 22 Gratt. 789. The majority opinion in that case provides that the Governor has power, with the consent of the prisoner, to substitute a milder sentence for the original punishment.

1932 Op. Atty. Gen. 102, 102; see also 1916 Op. Atty. Gen. 203, 203 (describing a reduction in a sentence from 90 days to 30 days incarceration as "in the nature of a commutation" which, if accepted by the convict, constitutes a lawful "conditional pardon").[5]

In addition, while a commutation reduces the legally prescribed punishment for the crime, it does so without vacating the conviction of the crime or canceling the collateral consequences that accompany it. By "merely substitut[ing] lighter for heavier punishment," a commutation "removes no stain, restores no civil privilege, and may be effected without the

---

[5] Because a commutation can reduce a sentence both in degree and in kind, an executive can "commute a sentence to the time already served or a death penalty to a life sentence." Kathleen Dean Moore, Pardons: Justice, Mercy, and the Public Interest 5 (1989); see also Humbert, supra, at 27 (giving, as examples of commutations, changing "the form of punishment from a penalty of death to one of life imprisonment" or "reduc[ing] a sentence of twenty-five years to one of fifteen years"). "The word [commutation] is a term of art and means, and long has meant, the change of one punishment for another and different punishment." United States ex rel. Brazier v. Commissioner of Immigration, 5 F.2d 162, 165 (2d Cir. 1924). It thus follows that "[a] punishment by imprisonment for one year is a different punishment from the fulfillment of a two-year sentence, and this is true even though the change is made when the two-year sentence is half served." Id.

17

consent and against the will of the prisoner." In re Charles, 222 P. 606, 608 (Kan. 1924). "Whereas commutation is a substitution of a milder form of punishment, pardon is an act of public conscience that relieves the recipient of all the legal consequences of the conviction." Schick, 419 U.S. at 273 n.8 (Marshall, J., dissenting). Thus, unlike a pardon, a mere commutation does not "make the offender a new man" in the eyes of the law. 4 Blackstone, supra, at * 402. His conviction stands untouched legally, and only his sentence is mitigated.

Unlike a pardon, a true commutation is imposed upon, not offered to, the convict. A commutation intends, in general, to satisfy the collective public conscience personified in the clement executive and, in particular, to tailor a more measured justice in a case that sometimes appears clear only in hindsight. See Biddle, 274 U.S. at 486 ("[I]t is the determination of the ultimate authority that the public welfare will be better served by inflicting less than what the judgment fixed."); Humbert, supra, at 68-69 (citing Biddle, 274 U.S. at 486). A commutation, therefore, "may be imposed upon the convict without his acceptance, and against his consent." Lee, 63 Va. (22 Gratt.) at 798.[6]

C. CONDITIONAL COMMUTATIVE PARDONS

Over a century ago in Lee, we recognized a hybrid act of clemency that fused the attributes of conditional pardons and true commutations. In that case, a Virginia governor issued what he titled a "commutation" to Lawrence Murphy that "commuted" his sentence from three

---

[6] "It is urged that the exercise of the power of commutation is but the exercise of the pardoning prerogative in a lesser degree, and that, if the gift of a pardon is incomplete without acceptance, the lesser grant is surely so." Chapman v. Scott, 10 F.2d 156, 159 (D. Conn. 1925), aff'd, 10 F.2d 690 (2d Cir. 1926). "We may acknowledge the premise without acceding to the conclusion, because the fact is that a distinction does exist between a pardon and a commutation, and the legal principles applicable are no longer open to question," and thus, "[t]he rule of law is well settled that a commutation does not need acceptance by the convict in order to be operative." Id. at 159-60 (relying on Lee, 63 Va. (22 Gratt.) at 798); see also In re Victor, 31 Ohio St. at 207.

18

years to twelve months. We acknowledged that the governor's warrant did "not purport to be a pardon of any sort, but a mere commutation of punishment." Id. at 799. The commutation did not vacate the conviction upon the completion of the reduced sentence, reduce the charge of conviction to a lesser charge, or purport to affect in any way the collateral consequences of the conviction. The only thing it did was "remit the punishment imposed by the law" and "substitute[d] another in its place." Id. at 801.

This presented quite a problem because the Constitution of Virginia, both then and now, authorized the governor to issue commutations only to those sentenced to death. Compare Va. Const. art. V, § 12, with Va. Const. art. IV, § 5 (1870).[7] In Virginia, "the executive is only authorized to commute capital punishment." Lee, 63 Va. (22 Gratt.) at 798. "The implication is almost irresistible that commutation, in other than capital cases, is forbidden by the constitution of 1851." Id. at 811 (Bouldin, J., dissenting). As an Attorney General of Virginia has explained:

> If the executive had been granted the general power to pardon without more, it is well settled that such a grant would have included the lesser power of commutation upon the theory that, if the whole offense may be pardoned, *a fortiori* a part of the punishment may be remitted or the sentence commuted. But the section has expressly defined the power to commute sentences by saying that the executive has the power to "commute capital punishment." The implication is plain that commutation in other than capital cases is excluded. . . . My conclusion is that in Virginia the Governor does not have the power to commute sentences except in capital cases.

1943 Op. Atty. Gen. 126, 127 (citing Lee, 63 Va. (22 Gratt.) at 798); see also 1916 Op. Atty. Gen. at 203.

---

[7] Pardons, on the other hand, could be issued to any convict convicted of capital or noncapital crimes. Va. Const. art. IV, § 5 (1870). The same is true in the current Constitution of Virginia. Va. Const. art. V, § 12.

19

Relying on settled principles, we concluded in <u>Lee</u> that the commutation given to Murphy was merely "the substitution of a less for a greater punishment" and that the governor's commutation merely "remitted" Murphy's "original punishment" and substituted in its place a "milder sentence." <u>Lee</u>, 63 Va. (22 Gratt.) at 799. These observations led us to a delicate question in <u>Lee</u>. Should the governor's clemency "be regarded as an attempted commutation of punishment," which would have been an unconstitutional, ultra vires act, or "as a conditional pardon," which would have been constitutionally authorized? <u>Id.</u> at 798. If the governor intended to issue a true commutation, the inference might arise "that he was either ignorant of his constitutional functions, or that it was his purpose to transcend them." <u>Id.</u> at 801.

We fought off that inference by presuming that the governor intended "to exercise just such powers as are vested in him by the constitution," and thus, "we should give his official acts a fair and liberal interpretation, so as to make them valid if possible." <u>Id.</u> Giving the governor the benefit of the doubt, we reasoned that his commutation, "[i]f followed by the acceptance of the convict . . . practically amounts to the same thing as a conditional pardon." <u>Id.</u> at 799. We dismissed the contention that the governor's commutation could not "be considered a conditional pardon, because neither the word 'pardon' nor any equivalent phrase is used therein." <u>Id.</u>[8]

"Upon the whole," <u>Lee</u> concluded, the governor's putative commutation should be judicially construed "as a *conditional pardon*, if not of the offence, certainly of the punishment imposed by the law." <u>Id.</u> at 802 (emphasis added). Murphy's pardon was conditioned upon his acceptance of the lesser, "substituted punishment." <u>Id.</u> While that may seem odd, we

---

[8] We understood that it would not be a full pardon, which "restores the competency of the offender and removes the infamy of the conviction." <u>Lee</u>, 63 Va. (22 Gratt.) at 799. Instead, it had the "operation and effect" of a partial pardon that, like a commutation, "merely remitt[ed] or releas[ed] the punishment without removing the guilt of the offender," and "[i]f followed by the acceptance of the convict, it practically amounts to the same thing as a conditional pardon." <u>Id.</u>

20

emphasized that the governor "is authorized to substitute, *with the consent of the prisoner*, any punishment recognized by statute or the common law as enforced in this State." Id. (emphasis added).

Because Murphy had already signed the commutation to denote his acceptance, we construed it to be a conditional pardon, rather than a true commutation, and thus constitutionally valid. Lee recognizes the constitutional authority of a Virginia governor "to impose a lesser punishment than that under which the prisoner stands sentenced, which is in the nature of a commutation, if done with the consent of the prisoner," because this act of executive clemency can be judicially construed "to be a conditional pardon and not a commutation of punishment." 1916 Op. Atty. Gen. at 203. This rather generous construction, however, depended entirely on "the condition of the convict's voluntarily submitting to the lesser punishment." Id. In short, the analytical structure of Lee rests upon a simple syllogism:

- A commutation is merely a lesser punishment and, in Virginia, can only be issued to convicts with death sentences.

- A commutation of a noncapital sentence will be judicially construed to be a lawful conditional pardon if it is conditioned upon the convict's acceptance of the lesser punishment.

- Thus, a conditional pardon can be rejected by the convict.

This approach remains faithful to the Constitution of Virginia while acknowledging that, in Virginia, "the pardon power has been used for commutation of a sentence for a term of years." William F. Stone, Jr., Pardons in Virginia, 26 Wash. & Lee L. Rev. 307, 309 n.15 (1969); see also 1932 Op. Atty. Gen. at 102; 1916 Op. Atty. Gen. at 203.

Applied to this case, the logic of Lee confirms Blount's view that his commutation could be constitutionally valid only if we construed it as a conditional pardon — the condition being that he accept the lesser, substituted punishment. He has expressly refused to do so, however.

21

As a result, even if we inferred a condition of acceptance in the commutation issued to Blount, that implied condition has not been satisfied. I thus would hold that the commutation — whether or not construed as a conditional pardon — is not legally binding on Blount and that his original sentences are still in effect.[9]

## D. THE NEW COMMUTATION PARADIGM

The majority's reasoning takes a very different path. Lee is briefly mentioned but then quickly sidelined by the conclusory statement that Blount did not receive either a "conditional pardon" or a "commutation." Ante at 10-11. I find this hard to understand given that Governor McDonnell treated Blount's request as one seeking a "conditional pardon" and granted that request by issuing a "COMMUTATION OF SENTENCE" followed by the notation, "Pardon granted: January 10, 2014." Id. at 38-39 (capitalization in original).[10]

By refusing to recognize this executive order as either a conditional pardon or a commutation, the majority's reasoning has the intended effect of extinguishing Blount's ability to reject Governor McDonnell's clemency, a right recognized by Lee. The majority's holding also will have the unintended, but easily foreseeable, effect of restructuring longstanding constitutional principles governing executive clemency in Virginia. All this is accomplished, remarkably so, without overruling Lee.

---

[9] I am aware that Blount's reason for rejecting his conditional commutative pardon is to set up a challenge in federal court against his life sentences based upon Graham v. Florida, 560 U.S. 48 (2010) — a subject that we have already addressed in Angel v. Commonwealth, 281 Va. 248, 704 S.E.2d 386 (2011). But see LeBlanc v. Mathena, No. 2:12cv340, 2015 U.S. Dist. LEXIS 86090, at *30-31 (E.D. Va. July 1, 2015). Even so, Blount's strategic reasons for rejecting the conditional commutative pardon are legally irrelevant.

[10] As noted earlier, the Commonwealth presented to the United States District Court an affidavit from an official with the Virginia Department of Corrections affirming that she had received the "Commutation" from the Governor that had "commuted" Blount's sentences. J.A. at 43.

1.

Let me begin by addressing the majority's assertion that Blount did not receive a "conditional pardon." Ante at 10-11. If that were true, then the only proper response would be for us to hold his commutation legally ineffectual as a matter of law. The essential task in Lee, after all, was to determine whether an apparent commutation of a term of incarceration was invalid due to the constitutional provision limiting commutations to death sentences. The governor's action in Lee did not "purport to be a pardon of any sort, but a mere commutation of punishment." Lee, 63 Va. (22 Gratt.) at 799. There was no express condition mentioned in the governor's commutation in Lee, much less a condition anything like the historical examples of conditions, such as banishment from the kingdom, servitude in the king's army, or hard labor for a specific period of time.[11]

In Lee, we nonetheless asked "whether the *acceptance by the convict* of the terms imposed by the executive does not give to the [putative commutation] the *operation and effect* of a conditional pardon." Id. (emphasis added). Our affirmative answer to that question was the very holding of Lee. It was this condition of "acceptance" that justified the judicial "construing" of the putative commutation to be, in practical if not technical terms, a "conditional pardon." Id. at 799, 802; see also 1916 Op. Atty. Gen. at 203 (interpreting the "condition" in Lee to be "the condition of the convict's voluntarily submitting to the lesser punishment"). Because it was a conditional pardon and not a mere commutation, we found it within the definitional boundaries, albeit the outer edges, of the executive clemency power.

In Blount's case, we face a nearly identical situation. He was not on death row. The only way his putative commutation could be constitutionally valid would be to construe it judicially,

---

[11] See supra note 4.

23

as we did in <u>Lee</u>, to be a conditional pardon in its "operation and effect" and to recognize an implied condition of "acceptance." <u>Id.</u> The end of this analysis gives Blount, as it gave the convict in <u>Lee</u>, the right to refuse Governor McDonnell's clemency offer — which, of course, he has done.

The majority bypasses this reasoning with the observation that the commutation issued to Blount did not have a "signature line" for him to acknowledge his acceptance, unlike the commutation issued to the convict in <u>Lee</u>. <u>See ante</u> at 10. I do not think the constitutionality of an act of executive clemency should turn on whether or not the transmittal document includes a signature line. The issue in <u>Lee</u> was not whether a signature line was printed on the commutation, but whether the convict had a right to reject the clemency offer. In a footnote, the majority adds that the convict in <u>Lee</u> got to spend his commuted sentence in a local jail instead of a state penitentiary. <u>Ante</u> at 11 n.2.[12] Here again, nothing in <u>Lee</u> intimates that this fact had any analytical significance. The majority cites no court, attorney general, or legal scholar in the 143 years since <u>Lee</u> that has intimated as much. If these are the only distinctions being drawn between <u>Lee</u> and this case, they appear to be so analytically thin as to suggest that <u>Lee</u> has been overruled *sub silentio*.

---

[12] The majority asserts that, in <u>Lee</u>, the executive clemency order changed the sentence "from imprisonment in the penitentiary to imprisonment in the city jail — a change in the <u>form</u> of imprisonment." <u>Ante</u> at 11 n.2 (emphasis in original). The apparent relevance of that assertion is to contrast the situation in <u>Lee</u> to the clemency given to Blount, which the majority says constitutes a change "in degree, not in kind." <u>Ante</u> at 11. The majority never explains how an act of clemency reducing a sentence from three years to twelve months (as in <u>Lee</u>) constitutes a change *in kind* but reducing six life sentences, plus 118 years imprisonment, to a mere forty years (as in Blount's case) is a mere reduction *in degree*.

24

2.

An even greater change in our law is the majority's unprecedented revision of the definition of "commutation." See ante at 6. Under the revised definition, "the term 'commutation' signified a change or substitution '*in kind*' of punishment, a substitution of a 'lesser' form for a 'greater' form. Thus, *a reduction in the term of imprisonment at that time would not have been understood as a 'commutation*,' but only a 'partial pardon.'" Ante at 6 (emphasis added) (commenting on the term "commutation" at the time of the adoption of the 1851 Constitution of Virginia); see also ante at 11.

I know of no legal authority supporting this novel assertion. The majority cites none.[13] No litigant in this case has mentioned, much less advocated, this thesis. The idea is inconsistent with over a thousand self-styled commutations issued by Virginia governors over the years that reduced terms of incarceration, see Br. of Resp't Attach. 2 (listing 1,640 executive commutations

---

[13] The majority relies on seven cases for this assertion. Six of them do not at all support the majority's assertion that a commutation, by definition, does *not* include the reduction of a term of incarceration. See Ogletree v. Dozier, 59 Ga. 800, 802 (1877) (holding that only the governor has the power to commute a sentence "from a higher to a lower punishment," including "from the hard work of a chain-gang to work on a farm"); Rich v. Chamberlain, 65 N.W. 235, 235 (Mich. 1895) (holding only that the governor could commute a sentence from state prison to a city house of correction under authority "imposed by law"); Ex parte Parker, 17 S.W. 658, 660 (Mo. 1891) (holding that a statute permitting the substitution of alternate punishment instead of a fine for an impecunious defendant did not "interfere with the governor's power" to commute); State v. Hildebrand, 95 A.2d 488, 490 (N.J. Super. Ct. App. Div. 1953) (holding only that "power of parole" must be distinguished from an executive's prerogative of pardons); Ex parte Janes, 1 Nev. 319, 321-22 (1865) (holding that the governor had no power to commute the prisoner's death sentence to one of life imprisonment); State ex rel. Att'y-Gen. v. Peters, 4 N.E. 81, 88 (Ohio 1885) (holding only that a statutory system of credits authorizing "parole" of prisoners does not interfere with executive's general power of clemency). The seventh case, moreover, appears to undermine the majority's assertion. People ex rel. Smith v. Jenkins, 156 N.E. 290, 292 (Ill. 1927) (upholding the commutation of a life sentence to a term of eight years and three months).

25

of noncapital sentences issued between 1873 and 2014), and is similarly inconsistent with the longstanding view of the Attorney General of Virginia, see 1932 Op. Atty. Gen. at 102.

The reason for the revised definition is to avoid the conclusion that clemency offered by Governor McDonnell to Blount — which identifies itself as "COMMUTATION OF SENTENCE," J.A. at 38 (capitalization in original) — is actually that: a true commutation. If it were, it would violate Article V, Section 12 of the Constitution of Virginia. That is not a problem here, the majority reasons, because reducing a term of incarceration from a higher to a lower degree is *not* a commutation. A commutation only exists, under this view, when a punishment is changed not merely in degree but rather in kind. Ante at 6, 11.

This narrow view of commutations appears to rest on two grounds: (a) a brief quote extracted from the extensive remarks of a single delegate to the 1851 Constitutional Convention; and (b) a speculative supposition based on a dissenting opinion issued by a single Justice on the United States Supreme Court in a case decided after the commutation provision in the 1851 Constitution of Virginia had been ratified. Neither of these grounds support the majority's revised definition of commutations in Virginia.

(a)

In support of its assertion that "a reduction in the term of imprisonment" could not constitute a commutation, ante at 6, the majority quotes Delegate Stanard at the Constitutional Convention of 1851, who said: "It ought not to be left to the executive to say that he shall not be pardoned and that he shall be punished, not in the *mode* prescribed by law for a crime of which he has been guilty, but by some other *mode* which the executive may think more proper to be applied," ante at 7. Stanard's use of the word "mode," the majority contends, proves that Stanard believed a commutation could only be legally valid if it changed the *kind* of the punishment, but

26

not the severity or degree of the punishment.  In context, however, the Stanard quote proves just the opposite.

At the 1851 Constitutional Convention, the original proposal addressing executive clemency permitted the governor to issue commutations for punishments generally.  See Register of the Debates and Proceedings of the Va. Reform Convention 71-72 (1851).  Stanard and other delegates sharply objected to this power.  "I regard the power to commute punishment as a dangerous one," he argued.  Debates and Proceedings of the Va. Reform Convention, Richmond Enquirer, Supp. No. 82, at 2 [hereinafter 1851 Va. Reform Convention Supp. No. 82] (publishing debates and proceedings from July 12-15, 1851) (on file with the Library of Virginia).[14]

The reason why Stanard felt this way had nothing to do with the supposed expansion of the executive's commutation power from changes in kind to a sentence to mere reductions in the degree of a sentence.  Rather, his point was that executive clemency should address only "the question of guilt or innocence."  Id.  If a convict was truly guilty, Stanard believed that "the law," not the chief executive, "ought to prescribe the punishment."  Id.

Stanard's point cannot be understood without taking into account that, in 1851, Virginia was among the first states to reform its criminal code to eliminate statutorily predetermined sentences and to authorize juries to fix the sentence within a statutory range.  See Jenia Iontcheva, Jury Sentencing as Democratic Practice, 89 Va. L. Rev. 311, 317 (2003) (recognizing

_____

[14] Due to "difficulties in the publication of the Register," only one published volume of the Register of the Debates and Proceedings of the Virginia Reform Convention exists, which covered the sessions held in January and February 1851.  2 Earl G. Swem, A Bibliography of Virginia 449-50 (1917) (naming the "unavoidable delay on the part of many members in revising and correcting their speeches" and confusion over payment for the publication as the two main difficulties).  Additionally, "the Debates were published in full as supplements to the regular issues" of several Richmond newspapers, and due to the difficulty in printing the Register, these supplements are the only official record of much of the 1851 Constitutional Convention.  Id.

that "Virginia was the first state to formally adopt jury sentencing for all criminal sentences"). "[T]his substitution of discretionary terms of imprisonment in the penitentiary for former *modes* of punishment was soon to sweep the nation." Nancy J. King, Lessons from the Past: The Origins of Felony Jury Sentencing in the United States, 78 Chi.-Kent L. Rev. 937, 963 (2003) (emphasis added). In this context, anything other than a jury fixing the criminal sentence, using Stanard's rhetoric, would be punishing a convict "not in the *mode* prescribed by law for the crime of which he has been [found] guilty." 1851 Va. Reform Convention Supp. No. 82, supra, at 2 (emphasis added).

To be sure, Stanard believed all commutations (not just commutations of death sentences) were improper because they allowed an executive to avoid his "responsibility of exercising the prerogative of pardon" and gave him "the dangerous prerogative" of leaving the conviction untouched but reducing the sentence "for such length of time as [the chief executive] shall decide to be correct." Id. It was anomalous, Stanard thought, to encourage the executive to "avoid the responsibility of pardoning the criminal" and assume "the responsibility of changing the punishment." Id.

In short, no contextual reading of Stanard's comments suggests that he believed a commutation was legally valid *only if* it changed the "kind of punishment," ante at 6, such as changing a death sentence to life imprisonment. Stanard, after all, rose in opposition to the provision allowing for commutations from a sentence of death to life imprisonment and moved to strike it from the draft. His main point was that changing a death sentence to anything other than death was the paradigmatic example of a legally *invalid* change from "the *mode* prescribed by law for a crime" that the convict committed. 1851 Va. Reform Convention Supp. No. 82, supra, at 2 (emphasis added).

28

(b)

Equally unpersuasive is the assertion that "Stanard's understanding of the term 'commutation,'" as the majority construes it, "finds support" from Justice McLean's dissent in Ex parte Wells, 59 U.S. 307, 319-20 (1856). Ante at 7. In Ex parte Wells, a convict sentenced to death received a "conditional pardon" that "commuted" the sentence to life imprisonment. 59 U.S. at 308. After accepting the conditional pardon, the convict filed a habeas petition claiming that he should be set free because the condition (his acceptance of a substituted life sentence) was unlawful.

The United States Supreme Court rejected this argument, holding that a "conditional pardon" may commute a death sentence to life imprisonment if the condition is "accepted by the convict." Id. at 315. It did not matter that a death sentence was different in kind than a life sentence, the Court explained, because the *conditional* nature of the pardon gave the convict the choice to accept or reject the "substitution" of one kind of sentence for another. Id. The conditional pardon included "a condition, without ability to enforce its acceptance, when accepted by the convict, is the substitution, by himself, of a lesser punishment than the law has imposed upon him, and he cannot complain if the law executes the choice he has made." Id.[15]

In his dissent, Justice McLean recognized that many courts had approved the practice of granting "conditional pardons by commuting the punishment." Id. at 318 (McLean, J., dissenting). The "power of commutation" being exercised in those conditional pardons, McLean

_____

[15] In this respect, Ex parte Wells resembles the situation facing Blount. "[B]y calling his clemency a conditional pardon, the President allowed (according, at least, to present practice) Wells to decide whether or not he would accept the proffered clemency. Had the President called his act of clemency a commutation, what it was in fact, Wells would not have had, according to existing law an opportunity of accepting or rejecting the proffered clemency." Humbert, supra, at 35-36 n.12.

29

understood, was broad enough to include the power to impose a "substitute" sentence (such as life imprisonment) in cases where the law "prescribes a specific penalty" (such as the death penalty for certain types of murder). Id. at 319.

McLean, however, did not suggest that commutations were invalid *unless* they changed the kind, rather than merely the degree, of punishment. What he objected to was the use of executive clemency power to reduce a punishment to a kind or degree that could not have been lawfully imposed. "If the law controlled the exercise of this power, by authorizing solitary confinement for life, as a substitute for the punishment of death, and so of other offences, the power would be unobjectionable," McLean explained. Id. at 319. "But where this power rests in the discretion of the executive, not only as to its exercise, but as to the *degree and kind* of punishment substituted, it does not seem to be a power fit to be exercised over a people subject only to the laws." Id. (emphasis added).

In other words, McLean's point had nothing to do with the majority's distinction between "in kind" punishment versus "in degree" punishment. Ante at 11. Rather, he was distinguishing between legitimate commutations (reducing a sentence, in kind or degree, to a punishment authorized by law for the crime) and illegitimate commutations (reducing a sentence, in kind or degree, to a punishment not authorized by law for the crime). Ex parte Wells, 59 U.S. at 319. What offended him all the more was the use of conditional pardons to make legitimate what he believed to be illegitimate. "To speak of a contract, by a convict, to suffer a punishment not known to the law, nor authorized by it, is a strange language in a government of laws." Id. "Where the law sanctions such an arrangement, *there can be no objection*; but when the obligation to suffer arises only from the force of a contract, it is a singular instrument of executive power." Id. (emphasis added).

30

I do not understand how any of this can be read to suggest that McLean defined commutations as excluding the power to reduce the degree of punishment and as including only the power to change the kind of punishment. Exactly the opposite inference is warranted. Executive clemency, McLean thought, could extend to "the degree and kind of punishment substituted" so long as the reduced punishment was "known to the law." Id. Only when executive clemency "overrides the law and the judgments of the court," id., would McLean consider it illegitimate.

As the Solicitor General correctly argues on brief, "Justice McLean took it as given that a noncapital sentence could be commuted" and instead argued only "that *death* sentences were categorically different." Br. of Resp't at 20 (emphasis in original). As McLean saw it, the executive clemency power did not permit a substituted punishment that "the law does not authorize." Id. (quoting Ex parte Wells, 59 U.S. at 323). McLean believed the underlying criminal law did not authorize "solitary confinement for life, as a substitute for the punishment of death," Ex parte Wells, 59 U.S. at 319, and thus, the executive had no power to make that change even with the convict's consent. The justices in the Ex parte Wells majority did not contest this assumption because it made no difference to them. If the convict accepted the conditional pardon, they reasoned, the executive's clemency could substitute an otherwise unlawful punishment for a lawful punishment. Id. at 315.

Even if I agreed with my colleagues' reading of McLean's opinion in Ex parte Wells, there are still reasons to discount its relevance. It was, after all, a dissent. No United States Supreme Court precedent has adopted McLean's views. It was also a dissent addressing an issue that McLean said had "never come before [that] court for decision." Id. at 318. To make matters worse, it was a dissent on a novel issue issued five years *after* the Virginia Constitutional

31

Convention of 1851. I find it hard to believe that the delegates at the Convention of 1851 were prescient enough to anticipate an opinion on a novel issue offered by a dissenting United States Supreme Court justice in 1856. I find it even harder to accept that we should be relying on it when we have Virginia precedent directly on point to guide our decision in this case.

3.

The majority's revised definition of commutations is a dramatic restructuring of clemency law in Virginia. In over a century from Lee until today, a Virginia governor could issue a non-consensual commutation only to prisoners on death row. For every other convict, a governor's effort to commute a noncapital sentence to a lesser term of incarceration could be valid only if judicially "constru[ed]" as a conditional pardon, Lee, 63 Va. (22 Gratt.) at 802, see also 1932 Op. Atty. Gen. at 102, which necessarily required either the express or implied condition of the convict's acceptance. The majority's reasoning removes the need for that condition by allowing all future commutations (now designated "partial pardons," ante at 6, 9, 11) to be issued in non-death penalty cases *without* the convict's acceptance — the very thing that Article V, Section 12 of the Constitution of Virginia clearly forbids.

My point is best illustrated by contrasting the Commonwealth's argument in this case to the majority's holding, which ironically is in the Commonwealth's favor. The Solicitor General understands that a "partial pardon" (when not characterized as a conditional pardon under Lee) "is functionally the same as a commutation." Br. of Resp't at 40. With skilled advocacy, the Solicitor General attempts to solve this problem by arguing that Governor McDonnell in fact issued a commutation to Blount, but, no matter, commutations of noncapital sentences (Lee notwithstanding) do not violate the Constitution of Virginia. In contrast, the majority solves this problem by inverting the Commonwealth's argument. The majority holds that commutations of

32

noncapital offenses do violate the Constitution of Virginia (as Lee held), but, no matter, Governor McDonnell did not issue a commutation — indeed, he could not have done so, because commutations by definition do not include a mere reduction in a convict's term of incarceration.

## III.

If Lee is to remain the law of Virginia, it should be applied to this case. If Lee is not to remain the law of Virginia, we should overrule it. Given that two major constitutional revisions have taken place since Lee,[16] without any suggestion that Lee misconstrued the executive clemency power, the latter approach would take a lot of explanation — far more than we have been offered in this case. But those are the only two options.

I would apply Lee and hold that Governor McDonnell issued exactly what he said he issued — a commutation of a criminal sentence — which would be constitutionally invalid if it could not be judicially construed as a conditional pardon.[17] I believe it should be, but that would

---

[16] 2 A.E. Dick Howard, Commentaries on the Constitution of Virginia 642 (1974) (stating that "[o]nly stylistic changes" were made to current Article V, Section 12 in the 1902 Constitution of Virginia); id. at 644 (noting only "one stylistic change" in Article V, Section 12 as a result of the 1971 revision of the Constitution of Virginia leaving the governor "with exactly those powers in this area given to him by the 1870 Constitution").

[17] I do not share the Solicitor General's fear that applying Lee "would bring into doubt the validity of the 1,640 commutations granted by Virginia governors since Lee was decided" or that "it would hobble future uses of the commutation power and insult the dignity of the Governor's actions." Br. of Resp't at 42. The only practical impact of applying Lee is to give convicts the right to reject a governor's offer of a conditional commutative pardon. No evidence has been presented that any of the prior 1,640 "commutations" issued over the years were rejected by the convicts that received them. Nor do I believe that the dignity of our chief executive will suffer in the slightest if Blount, or any other criminal convict, refuses an offer of clemency. The executive's dignity, unassailably demonstrated by his offer of commutative grace, remains untouched by the response given to it.

I also acknowledge, but find unpersuasive, the Solicitor General's reliance on Professor A.E. Dick Howard's statement that "the effect of the Governor's power to pardon must be determined by the same rules applicable to a pardon by the British Crown or the United States President." Br. of Resp't at 13, 22 (quoting 2 Howard, supra note 16, at 646); see also id. at 27.

require Blount's acceptance, something that he has refused to give. Because the reasoning and

holding of <u>Lee</u> requires us to honor his right to do so, I respectfully dissent.

---

For this statement, Professor Howard cites <u>Wilborn v. Saunders</u>, 170 Va. 153, 161, 195 S.E. 723, 726 (1938), which in turn quotes <u>Edwards</u>, 78 Va. at 44.

      For three reasons, I do not believe Professor Howard's observation suggests that we should overrule <u>Lee</u>. First, <u>Wilborn</u> cited <u>Lee</u> with approval and made no suggestion that any aspect of <u>Lee</u> should be reconsidered. <u>Wilborn</u>, 170 Va. at 158-59, 195 S.E.2d at 725. Second, <u>Edwards</u> dealt only with the "effect" of the "pardoning power," 78 Va. at 44, and not the *scope* of the power of *commutation*. Third, neither Professor Howard nor the Solicitor General addresses the longstanding opinion of the Attorney General "that in Virginia the Governor does not have the power to commute sentences except in capital cases." 1943 Op. Atty. Gen. at 127 (citing <u>Lee</u>, 63 Va. (22 Gratt.) at 798).