JUSTICE MIMS, dissenting.
Because the Court's holding that petitioners have standing is not supported by our precedents limiting the extraordinary remedy of mandamus, and because the General Assembly by statute has established the standing requirement and mechanism for challenges to voter registration, I must reluctantly dissent.
I. Standing is Jurisdictional and Fundamental to the Limited Role of the Judiciary
The question of standing can be technical and esoteric. Yet it is fundamental to the proper function of the judiciary. In fact, the doctrine of standing implicates our very jurisdiction and our limited role within our constitutional system. See Nicholas v. Lawrence , 161 Va. 589, 593, 171 S.E. 673, 674 (1933) (explaining that the petitioners had failed to show an injury "peculiar" to themselves and therefore ruling that "this [C]ourt has no jurisdiction to review this case"); see also *726 Warth v. Seldin , 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (observing that the question of standing "is founded in concern about the proper-and properly limited-role of the courts in a democratic society"). We have no authority to reach the merits of a case unless the party seeking to invoke this Court's jurisdiction has satisfied the requirements of standing.
There is no question regarding the importance of this case. Nonetheless, the importance of a case has no role in a court's standing inquiry. The judiciary must not decide cases where the parties do not have standing "however interesting and important to the public [those cases] may be." Nicholas , 161 Va. at 593, 171 S.E. at 674. Rather, courts act to adjudicate particularized legal rights, to resolve disputes that directly affect the legal interests of the parties invoking their jurisdiction. Id. To this end, our standing inquiry must "concern[ ] itself with the characteristics of the person or entity who files suit"-not the importance of the issues raised. Westlake Props. v. Westlake Pointe Prop. Owners Ass'n , 273 Va. 107, 120, 639 S.E.2d 257, 265 (2007) (internal quotation marks and citation omitted).[1]
The limited role of the judiciary, together with the fundamental constitutional doctrine of separation of powers, counsel that the standing inquiry must be particularly rigorous when a litigant seeks the extraordinary remedy of mandamus, by which courts may compel public officials, and particularly officials in co-equal branches of government, to perform their duties. See Goldman v. Landsidle , 262 Va. 364, 370, 552 S.E.2d 67, 70 (2001) ; see also Spokeo, Inc. v. Robins , 578 U.S. ----, ----, 136 S.Ct. 1540, 1547, 194 L.Ed.2d 635 (2016) (noting that federal standing doctrine "confines the federal courts to a properly judicial role"). To that end, this Court has carefully reserved its coercive power of mandamus and established "safeguards" around it. See, e.g. , Richmond-Greyhound Lines, Inc. v. Davis , 200 Va. 147, 151, 104 S.E.2d 813, 816 (1958). The standing requirement, being jurisdictional, is the first such safeguard.
II. The Principles from Goldman v. Landsidle Control
This Court has been rigorous in requiring parties to establish standing "to make certain that a party who asserts a particular position has the legal right to do so and that his rights will be affected by the disposition of the case." Goldman , 262 Va. at 371, 552 S.E.2d at 71 (collecting cases). Principles of judicial restraint require courts not to proceed to the merits until a party shows a "particularized injury" to a cognizable personal or property right. See Wilkins v. West , 264 Va. 447, 459, 571 S.E.2d 100, 106 (2002) (describing concept of "injury in fact"); Goldman , 262 Va. at 373, 552 S.E.2d at 72 (noting that a party must show an interest that is "separate and distinct" from that of the public at large to establish standing); Cupp v. Board of Supervisors , 227 Va. 580, 589, 318 S.E.2d 407, 411 (1984) (requiring a "personal stake in the outcome" to "invoke the court's jurisdiction"). Among other reasons, we require litigants to demonstrate a "particularized injury" to a recognized personal or property right to prevent this Court from becoming embroiled in political disputes.
In Goldman , this Court clarified the standing inquiry applicable to "citizen" or "taxpayer" suits seeking mandamus relief against the Commonwealth and its officers. We held that "in the absence of a statutory right, a citizen or taxpayer does not have standing to seek mandamus relief against the Commonwealth unless he can demonstrate a direct interest, pecuniary or otherwise, in the outcome of the controversy that is separate and distinct from the interest of the public at large." 262 Va. at 373, 552 S.E.2d at 72 (emphasis added). The rationale for this rule is twofold. First, a single taxpayer's interest in the Commonwealth's funds is shared with several million persons, and therefore it is "comparatively minute and indeterminable." Id. at 372, 552 S.E.2d at 71 (internal quotation marks and citation omitted). Second, the *727 effect of payments from those funds on the taxpayer's interest is "so remote, fluctuating, and uncertain, that no basis is provided for judicial intervention." Id. , 552 S.E.2d at 72.[2]
The caveat "in the absence of a statutory right" found in Goldman should not be dismissed lightly. To acquire the standing necessary to assert a right of action "in the absence of a statutory right," parties must identify a "historically recognized" personal or property right at common law, or a cognizable right arising under the Constitution of Virginia, and allege that such right has been violated in a manner that creates an injury particularized to them. See Cherrie v. Virginia Health Servs. , Record No. 151758, slip op. at 4, 292 Va. ----, ----, 787 S.E.2d 855, 857, 2016 WL 3901455 (July 14, 2016). Otherwise, their interest is not "separate and distinct from the interest of the public at large." Goldman , 262 Va. at 373, 552 S.E.2d at 72. A statute, however, may confer a right and define the prerequisites to standing. In other words, the General Assembly may, by statute, create a right of action and establish standing requirements that are less stringent than the "particularized injury" requirement. See Cherrie , Record No. 151758, slip. op. at 4, 292 Va. at ----, 787 S.E.2d at 858 (explaining that the statutory standing inquiry asks "whether the plaintiff is a member of the class given authority by a statute to bring suit") (internal quotation marks and citation omitted).
The petitioners have not identified any historically recognized common-law right of action to challenge the registration of voters-reinstated or otherwise. See id. Nor can they rely on a statutory right. The General Assembly long ago created a statutory right of action that permits members of the public to challenge the registration of voters, but that right of action is not broad enough to encompass this action.[3] Likewise, the General Assembly could have expanded standing in the mandamus context post-Goldman . Yet fifteen legislative sessions have come and gone with no such action.
Thus, we must be circumspect with how we exercise our power to find standing, lest we create a right of action that tramples upon the constitutional role of the General Assembly to enact statutes that establish standing requirements. See Concerned Taxpayers v. County of Brunswick , 249 Va. 320, 330, 455 S.E.2d 712, 717 (1995) ("When a statute creates a right and provides a remedy for the vindication of that right, then that remedy is exclusive unless the statute says otherwise.") (internal quotation marks, alteration and citations omitted). In other words, it is our duty to ensure the petitioners have alleged a particularized injury to a right protected by the Constitution. Otherwise, we risk creating a judicially-crafted expansion of statutes passed by the General Assembly-"the direct agent and representative of the sovereignty of the people, ... [and] the natural and necessary repository of power, to be exercised at its discretion for the general good." Willis v. Kalmbach , 109 Va. 475, 492, 64 S.E. 342, 349 (1909).
III. Wilkins v. West is Inapposite
Relying on Wilkins v. West , 264 Va. 447, 571 S.E.2d 100 (2002), the majority concludes that the petitioners, in their capacity as voters who intend to vote in the 2016 election, should receive the benefit of an "inference of *728 particularized injury" that vests them with standing to seek mandamus. Supra at 8, 788 S.E.2d at 713. But that conclusion does not follow from Wilkins .[4]
In Wilkins , this Court considered the standing requirements necessary to maintain a challenge to redistricting legislation in two contexts: (1) claims that electoral districts were racially gerrymandered, and (2) claims that electoral districts violated the compactness and contiguity requirements of Article II, Section 6 of the Constitution of Virginia. Id. at 459-61, 571 S.E.2d at 106-07. This Court began by reciting the federal standing principles applicable in the context of racial gerrymandering:
[T]he [United States] Supreme Court concluded that an inference of particularized injury was created for a plaintiff who resides in a racially gerrymandered district because such resident "has been denied equal treatment because of the legislature's reliance on racial criteria ...."
Id. at 459, 571 S.E.2d at 107 (quoting United States v. Hays , 515 U.S. 737, 745, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995) ). However, demonstrating the rigor of our traditional standing analysis, we noted that "[a] person who does not live in such a district does not suffer such harm and is not entitled to the inference of harm." Id. at 460, 571 S.E.2d at 107. Rather, that person must "produce[ ] specific evidence to show individualized injury resulting from racial classification." Id. Thus, we recognized that a person residing in an allegedly racially gerrymandered district has a direct interest in the matter by virtue of his residency in such district, which is "separate and distinct" from residents of a non-gerrymandered district. See Goldman , 262 Va. at 373, 552 S.E.2d at 72. However, a nonresident could only acquire standing by producing specific evidence of an "individualized injury" that renders his interest "separate and distinct" from other nonresidents.
In the same case, this Court applied these same principles in the context of claims that electoral districts violated the compactness and contiguity requirements of Article II, Section 6 of the Constitution of Virginia :
If a district fails to meet the compactness and contiguous requirements, residents of that district are directly affected by the legislature's failure to comply with the Constitution of Virginia. In the absence of residency in a challenged district, a complainant can establish standing only by showing a particularized injury.
Wilkins , 264 Va. at 460, 571 S.E.2d at 107. Thus, residence in a district challenged on the grounds of compactness and contiguity permits an inference of such injury which is not afforded to residents of unchallenged districts. See id. Again, this is because such injury renders a resident's interest "separate and distinct" from nonresidents, who must produce specific evidence of a particularized injury.
To find that petitioners have standing in their capacity as voters, the majority creates from Wilkins an analogy that is supported by neither precedent nor fact. The analogy between a redistricting map that unconstitutionally "packs" voters into a single district and an executive order that allegedly "packed ... 206,000 disqualified voters" into the entire Commonwealth, supra at 10, 788 S.E.2d at 714, cannot survive scrutiny. To begin, this analogy fails because Wilkins involved a claim that certain districts were racially gerrymandered. Thus, the claim turned on the question of whether residents of those districts had been denied "equal treatment" under the law vis-à -vis residents of other districts due to the improper reliance on racial criteria and thereby were subjected to "special representational harms." Id. at 459-60, 571 S.E.2d at 107 (internal quotation marks and citations omitted).[5] The *729 analogy also fails because the concept of "packing" requires a comparison-one voter or class of voters is harmed comparatively rather than absolutely.[6] For example, unconstitutionally drawing a districting map so that certain districts are overpopulated injures residents of those districts by rendering their votes less effective vis-à - vis voters of underpopulated districts. In other words, residents in unconstitutionally overpopulated districts are under-represented by elected officials-a case of clear "representational harm." See Reynolds v. Sims , 377 U.S. 533, 558, 562-63, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) (discussing "one person, one vote" principle). Thus, residents of an unconstitutionally overpopulated district have an interest that is "separate and distinct" from residents in other districts. But in the present case, there is only one "district"-the Commonwealth-so the addition of voters impacts each currently registered voter equally : no vote becomes more or less effective relative to another. Accordingly, in a general election, no single voter has an interest in the size of the electorate that is "separate and distinct" from the millions of other voters in the Commonwealth.[7]
The majority concludes that the petitioners have a sufficient interest in the case such that the parties will be "actual adversaries." Supra at 11, 788 S.E.2d at 715 (quoting Cupp , 227 Va. at 589, 318 S.E.2d at 411 ). Yet that alone is insufficient to establish standing in the mandamus context and overrules Goldman sub silentio . The "sufficient interest" requirement from Cupp goes hand in hand with our requirement that the interest be *730 "separate and distinct" from the public at large. See Goldman , 262 Va. at 371-73, 552 S.E.2d at 71-72 (reviewing the principles of standing).
In what way have the petitioners as voters distinguished themselves from the public at large? Is it because they are registered voters and not everyone in the public at large is a registered voter? But this is no different than suggesting a taxpayer has an interest in how the government allocates funds that is "separate and distinct" from the public at large. The Court rejected this logic in Goldman and required something more than status as a resident taxpayer to acquire standing.
IV. It is Conceivable that Standing Could be Established upon a More Developed Record
At this time, the petitioners as voters have not shown a representational injury.[8] They can only generally allege that they are injured per se by the expanded electorate. This generalized grievance fails to establish an interest that is "separate and distinct" from the public at large. There are several million voters in the Commonwealth: it follows that an individual's interest in the size of the electorate is "comparatively minute," and attempting to quantify how the individuals with restored voting rights will vote relative to the petitioners is so "uncertain, that no basis is provided for judicial intervention." Goldman , 262 Va. at 372, 552 S.E.2d at 71-72. As noted earlier, the General Assembly has the power to grant standing by statute to individuals seeking mandamus against the Commonwealth, but it has declined to do so. The General Assembly has allowed Goldman to stand, and its principles control this case.
I note, though, that the petitioners' present inability to establish standing under our precedent is not a fault of their own making. There may be a path by which some or all of the petitioners can obtain standing, which would permit this Court to properly consider the important constitutional questions presented. In mandamus proceedings, the Court has provided a mechanism for taking evidence as needed. See Rule 5:7(d) ("If this Court or the designated Justice determines that evidence is desirable, depositions shall be taken ...."). Upon an amended petition, this mechanism could be initiated and completed on an expedited basis, including entry of an order requiring that the full database of individuals with restored voting rights be provided prior to the taking of such deposition.[9] At this point, I cannot foreclose the possibility that the petitioners could then produce satisfactory evidence of standing. But our limited role within our constitutional system does not allow us to consider these possibilities in the abstract on the virtually non-existent record before us.
Accordingly, I would defer a decision in this matter to allow the parties to take evidence regarding the potential impact of the Executive Order on an expedited basis, should they so choose, and thereafter provide further briefing on the question of standing.
JUSTICE POWELL, with whom JUSTICE GOODWYN joins, dissenting.
I agree with the majority that the dominant role in the articulation of public policy in the Commonwealth rests with the elected branches. I also agree that our role is not to judge the desirability or the wisdom of policy choices. Finally, I agree that our proper role is to interpret the law. I would further add that, in the present case, our role is limited *731 to interpreting the law with regard to Governor McAuliffe's April 22, 2016 Executive Order as written and the subsequent similar orders that are now before us.
It is in consideration of this role that I respectfully disagree with the majority's issuance of a writ of mandamus. Specifically, I disagree with the majority's conclusions (1) that petitioners have standing to seek mandamus and prohibition relief; (2) that the Executive Order was unconstitutional and constituted "an unlawful executive suspension of laws" in contravention of Article I, section 7 of the Constitution of Virginia ; and (3) ordering all election officials to ignore the Executive Order and rescind any voter rights restored as a result of the Executive Order.
I. Standing
"The point of standing is to ensure that the person who asserts a position has a substantial legal right to do so and that his rights will be affected by the disposition of the case." Cupp v. Board of Supervisors of Fairfax County , 227 Va. 580, 589, 318 S.E.2d 407, 411 (1984). "[I]t is not sufficient that the sole interest of [a] petitioner is to advance some perceived public right or to redress some anticipated public injury when the only wrong he has suffered is in common with other persons similarly situated." Virginia Beach Beautification Comm'n v. Board of Zoning Appeals , 231 Va. 415, 419, 344 S.E.2d 899, 902 (1986). Thus, it is incumbent on the petitioners to identify either "a statutory right" or a "direct interest, pecuniary or otherwise, in the outcome of the controversy that is separate and distinct from the interest of the public at large." Goldman v. Landsidle , 262 Va. 364, 373, 552 S.E.2d 67, 72 (2001).
The majority bases its ruling on its interpretation of this Court's holding in Wilkins v. West , 264 Va. 447, 571 S.E.2d 100 (2002). According to the majority, Wilkins stands for the proposition that "an individual's residency in an [unconstitutionally configured] district is sufficient to confer standing to challenge non-compliance with a constitutional provision in 'the voting context,' without 'further proof of a personalized injury.' " I disagree with the breadth of the majority's interpretation of Wilkins .
The litigation in Wilkins was initiated by voters who claimed that House and Senate districts were " 'designed with the avowed, race-based goal of maximizing the number of minority voters' in violation of Article I, Sections 1 and 11 of the Constitution of Virginia." Id. at 456, 571 S.E.2d at 104. In ruling that the voters had standing to bring the action, this Court expressly adopted "the standing principles enunciated by the Supreme Court in United States v. Hays , 515 U.S. 737, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995)." Id. at 459, 571 S.E.2d at 106. Thus, contrary to the majority's ruling, this Court has recognized that, in cases challenging non-compliance with a constitutional provision in the voting context, both Virginia law and federal law govern. Furthermore, "the same standard is appropriate to establish standing for allegations that electoral districts violate the compactness and contiguous requirements of Article II, Section 6 of the Constitution of Virginia." Id. at 460, 571 S.E.2d at 107.
Under federal standing principles,
standing requires the plaintiff to show that he or she has suffered an injury in fact-an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.
Id. at 459, 571 S.E.2d at 106 (citation and internal quotation marks omitted).
In addition to adopting the injury in fact requirement, the Court in Wilkins expressly rejected the proposition that "any citizen of a state would have standing to challenge a redistricting statute on an equal protection claim regardless of whether such citizen was personally denied equal treatment." Id. at 459, 571 S.E.2d at 106-07. Absent such a requirement, an individual "would be asserting only a generalized grievance against governmental conduct of which he or she does not approve." Id. at 460, 571 S.E.2d at 107. In other words, we explicitly held that proof of a personalized injury is required to confer standing to challenge non-compliance with a constitutional provision in the voting context.
The majority, however, takes the position that Wilkins stands for the notion that residency in an allegedly unconstitutional district, *732 without anything more, is sufficient to confer standing without any showing of an injury in fact. Such an interpretation removes the context of our holding in Wilkins . Relying on the United States Supreme Court's holding in Hays , we explained that, due to the insidious nature of racial gerrymandering, "demonstration of a particularized injury ... may be difficult." Id. at 459, 571 S.E.2d at 107. Accordingly,
an inference of particularized injury was created for a plaintiff who resides in a racially gerrymandered district because such resident "has been denied equal treatment because of the legislature's reliance on racial criteria ...." This inference vests the resident of the district with standing ... to challenge the use of racial classification in creating that district. "
Id. at 459-60, 571 S.E.2d at 107 (quoting Hays , 515 U.S. at 745, 115 S.Ct. 2431 ) (emphasis added).
Thus, under Wilkins , residency, without more, only confers standing in one particular situation: where the claim is based on racial gerrymandering. In the absence of such a claim, a plaintiff must demonstrate an injury in fact in order to have standing. " 'Unless such evidence is present, that plaintiff would be asserting only a generalized grievance against governmental conduct of which he or she does not approve.' " Id. at 460, 571 S.E.2d at 107 (quoting Hays , 515 U.S. at 745, 115 S.Ct. 2431 ).
Here, petitioners have failed to make any showing of injury in fact. Rather, they merely claim that they, along with every other voter in the Commonwealth, have had their voting rights diluted. Such an injury could hardly be considered personal. Thus, petitioners' claim seeks to "[m]erely advanc[e] a public right or redress[ ] a public injury," which we have expressly stated "cannot confer standing on a complainant." Id. at 458, 571 S.E.2d at 106 (citing Virginia Beach Beautification Comm'n , 231 Va. at 419, 344 S.E.2d at 902 ).
Indeed, the petitioners' vague voter dilution argument fails to point to any concrete evidence showing that their votes will be diluted. "As the Framers of the Constitution and the Fourteenth Amendment comprehended, representatives serve all residents, not just those eligible or registered to vote." Evenwel v. Abbott , 578 U.S. ----, ----, 136 S.Ct. 1120, 1132, 194 L.Ed.2d 291 (2016). The Supreme Court has "recognized that the one-person, one-vote rule is designed to facilitate '[f]air and effective representation,' and evaluated compliance with the rule based on total population alone." Id. (quoting Gaffney v. Cummings , 412 U.S. 735, 748, 750, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973) ). "By ensuring that each representative is subject to requests and suggestions from the same number of constituents, total-population apportionment promotes equitable and effective representation." Id. In the context of this case, the reinstated voters would already be counted in the population total for their respective districts, thus there is no reason petitioners' votes would be diluted or could be diluted. See Reynolds v. Sims , 377 U.S. 533, 568, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) ("[A]n individual's right to vote for State legislators is unconstitutionally impaired when its weight is in a substantial fashion diluted when compared with votes of citizens living in other parts of the State."); Gray v. Sanders , 372 U.S. 368, 379-80, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963) ("The concept of 'we the people' under the Constitution visualizes no preferred class of voters but equality among those who meet the basic qualifications.").[1]
*733 Furthermore, the petitioners have not identified, nor can they identify, a "statute that gives them a legally enforceable right to have the Court compel" the Governor to not issue Executive Orders that restore voting rights to groups of felons who have served their sentences. Goldman , 262 Va. at 374, 552 S.E.2d at 73. The only statutes available to petitioners which allow them to challenge the restored voters, defeat their argument that they are without an adequate remedy at law to right the perceived wrong against them. Code §§ 24.2-431 through -433 provide a procedure for voters to challenge the lawfulness of another voter's registration. The majority states, in a footnote, that this remedy is not adequate "[g]iven the magnitude, scope, timing, and imprecision of Governor McAuliffe's Executive Order." Assuming the majority is correct and the remedy available under Code §§ 24.2-431 through -433 is inadequate, the petitioners still would not have standing to seek mandamus. To have standing to pursue a writ of mandamus, a petitioner must present "such a state of facts ... as to show that the petitioner has a clear right to the performance of the thing demanded, and that a corresponding duty rests upon the officer to perform that particular thing." Milliner v. Harrison , 73 Va. 422, 426 (1879). However, as discussed below, because Governor McAuliffe's actions were not unconstitutional, petitioners do not have a clear right to the issuance of a writ of mandamus.
II. Constitutionality of the Executive Order
A. The Executive Order Did Not Violate the Suspension Clause
In concluding that the Executive Order violates the Suspension Clause,[2] Article I, Section 7 of the Constitution of Virginia, the majority ignores the plain language of that section and of the Disenfranchisement Clause, Article II, Section 1, and the Restoration Clause, Article V, Section 12, which clearly contemplate that the Governor has the authority to "remove political disabilities consequent upon conviction." Not only is the majority opinion, with respect to the purported violation of the Suspension Clause, not supported by the plain language of the Constitution of Virginia, but it is also decided in a manner that is contrary to established Virginia jurisprudence.
To the extent one could view the Governor's action in restoring political disabilities as a suspension of law, the Governor would be "suspending" the law each time he removed a person's political disabilities, whether he did so on an individual basis or by categorical order. But by approving the Disenfranchisement Clause of the Constitution and by giving the Governor executive clemency powers in the Restoration Clause, the people of the Commonwealth have given their consent to the Governor's suspension of the law within the limitations set out in the Restoration Clause. Virginia Governors have been exercising this authority for over two hundred years and there is no dispute that a governor's exercise of such clemency power on an individual basis does not violate the Suspension Clause.
The merits of this case do not concern the issue of whether the Governor has done something he has no right to do, but rather whether he has done what he has a right to do in an unconstitutional manner. Indeed, it is particularly telling that the majority does not dispute the fact that the Governor may remove an individual felon's political disabilities for any reason he chooses, including that he has served his sentence. Moreover, the majority acknowledges that the Governor could use many individual orders to achieve the mass restoration of rights he sought to accomplish under the Executive Order. Thus, the majority, in essence, takes the position that the Suspension Clause requires the Governor to exercise his executive powers in a different, less efficient manner.[3]
*734 "In construing constitutional provisions, the Court is 'not permitted to speculate on what the framers of [a] section might have meant to say, but are, of necessity, controlled by what they did say.' " Blount v. Clarke , 291 Va. 198, 205, 782 S.E.2d 152, 155 (2016) (quoting Harrison v. Day , 200 Va. 439, 448, 106 S.E.2d 636, 644 (1959) ). "If there are 'no doubtful or ambiguous words or terms used, we are limited to the language of the section itself and are not at liberty to search for meaning, intent or purpose beyond the instrument.' " Id. (quoting Harrison , 200 Va. at 448, 106 S.E.2d at 644 ).
Constitutions are not esoteric documents and recondite learning ought to be unnecessary when we come to interpret provisions apparently plain. They speak for the people in convention assembled, and must be obeyed.
It is a general rule that the words of a Constitution are to be understood in the sense in which they are popularly employed, unless the context or the very nature of the subject indicates otherwise.
Id. (quoting Lipscomb v. Nuckols , 161 Va. 936, 945, 172 S.E. 886, 889 (1934) ).
The Suspension Clause states "[t]hat all power of suspending laws, or the execution of laws, by any authority, without consent of the representatives of the people, is injurious to their rights, and ought not to be exercised." Va. Const. art. I, § 7. The relevant provision from the Disenfranchisement Clause states, "No person who has been convicted of a felony shall be qualified to vote unless his civil rights have been restored by the Governor or other appropriate authority." Va. Const. art. II, § 1. The Restoration Clause states, in relevant part, that the Governor shall have the power "to remove political disabilities consequent upon conviction." Va. Const. art. V, § 12. Notably, the Suspension Clause does not expressly mention the clemency power, nor does it place any unstated restrictions on the Governor's clemency powers. Further, the Suspension Clause does not differentiate between individual or categorical exercises of the clemency power.
Even if one were to suppose a tension existed between the Suspension Clause and the Restoration Clause, such tension could be relieved by the recognized rules of statutory construction. This Court has explained that "provisions of the Constitution should be construed together whenever possible," Miller v. Ayres , 213 Va. 251, 267, 191 S.E.2d 261, 273 (1972), and interpreted to avoid "a strained construction of the language used." Lipscomb , 161 Va. at 949, 172 S.E. at 891.
Moreover, we have long recognized that "the specific provision must govern over the general provision." Miller , 213 Va. at 267, 191 S.E.2d at 273 (1972) (citing Pierce v. Dennis , 205 Va. 478, 138 S.E.2d 6 (1964) ). Here, the Restoration Clause specifically grants the Governor the power to restore voting rights to convicted felons, whereas the Suspension Clause provides a general limitation on the Governor's power to suspend the law. As the more specific provision, it is clear that the Restoration Clause must govern. Thus, when these canons of statutory construction are all applied to the provisions at issue in the present case, it is readily apparent that, by approving the Disenfranchisement Clause and granting the Governor clemency powers in the Restoration Clause, the people have expressly consented to the Governor's authority to restore voting rights to felons. The assertion that the Suspension Clause plays no role as a check on a Governor's clemency power as specifically granted by the Constitution of Virginia (see Law Professors' Amici Curiae Brief in Support of Respondents) is not bold, but rather, would seem to have been a widely accepted correct statement of Virginia law prior to the majority's decision. See, e.g. , In re Phillips , 265 Va. 81, 88, 574 S.E.2d 270, 273 (2003) (recognizing that the power to restore political disabilities is vested solely in the Governor to such a degree *735 that "there is no right of appeal for the Governor's decision").
The purpose of the Suspension Clause as revealed by its history and language is to prevent ultra vires acts undertaken without authority which result in the suspension of the law. It is not to correct wrongful use of authority granted by the Constitution of Virginia or to control the manner in which that constitutional power is properly used. In my opinion, the majority misconstrues the proper function of the Suspension Clause and improperly defines what suspension means.
At the outset it will be as well to define the term[ ] "suspend" .... The ... term is generally applied to the abrogation of a statute or statutes, so that they lose altogether their binding force-the Declaration of Indulgence is the best illustration of the exercise of this power. ... [T]he law is put out of action; ... it is in substance repealed .... [T]here is a wide difference between [this] power[ ] and the power to pardon. [Suspension] affect [s] the legality of the act done. [It] make[s] legal what would otherwise be illegal. A pardon does not affect the legality of the act. It simply frees a guilty person from the legal consequences of his illegal acts.
6 W.S. Holdsworth, A History of English Law 217-18 (1924). Thus, the Suspension Clause is only relevant when the act is not based on, or exceeds, a grant of constitutional authority. In this instance, the Suspension Clause is only relevant if the Executive Order's categorical grant of restoration of rights exceeded the constitutional authority granted to the Governor by the Restoration Clause.
The relevant voter qualification provision in the Disenfranchisement Clause states that "[n]o person who has been convicted of a felony shall be qualified to vote unless his civil rights have been restored by the Governor or other appropriate authority." Va. Const. art. II, § 1. The Executive Order issued by the Governor states in relevant part that it orders
the removal of the political disabilities consequent upon conviction of a felony ... from all those individuals who have, as of this 22nd day of April 2016, (1) completed their sentences of incarceration for any and all felony convictions; and (2) completed their sentences of supervised release, including probation and parole, for any and all felony convictions.
A plain reading of the language in Article II, Section 1 and the Executive Order indicates conclusively that the Executive Order does not abrogate the operation of the Disenfranchisement Clause such that it loses altogether its binding force. Therefore, the Executive Order does not violate the Suspension Clause.
Despite these long-espoused standards of construction, the majority reads the constitutional text in a manner that promotes form over substance to create a logically inconsistent limitation on the Governor's authority. Indeed, rather than confining itself to an examination of the plain language of the Constitution of Virginia and the Executive Order to discern whether the Executive Order violates the Suspension Clause, the majority announces an innovative "rule-exception sequence" inversion theory. That theory purportedly allows the majority to speculate as to the effect of the language in the Executive Order and potential future executive orders and assume that such effect de facto changes the language of the Constitution. This new approach, in essence, allows a court to pick and choose what parts of the Constitution it is going to enforce, by ignoring parts of the Constitution it interprets to be "exceptions." In applying this new theory of constitutional interpretation, for which the majority cites no precedential authority, and for which I cannot find any support, from any jurisdiction, the majority does not concern itself with whether there was an actual suspension of any particular provision as written, but rather whether there was the suspension of a "general principle" of law.
Notably, in applying its new theory, the majority fails to consider the entirety of the constitutional provision it claims was suspended by the Governor's actions. The majority claims that the Executive Order had the effect of suspending the portion of the Disenfranchisement Clause that states "[n]o person who has been convicted of a felony shall be qualified to vote."
*736 Va. Const. art. II, § 1. By taking this new approach, the majority ignores the fact that the clause contains an express exception: "[n]o person who has been convicted of a felony shall be qualified to vote unless his rights have been restored by the Governor ." Id. (emphasis added). In other words, in holding that the Executive Order suspends the Disenfranchisement Clause, the majority ignores the fact that, to the extent that it is a suspension, the language of our Constitution expressly allows for such suspension.
It is particularly concerning that this new theory does not require a court to look at the actual language of a supposedly suspended law in deciding if an executive order suspends it. Instead, a court can consider a general rule of law and ignore what it terms as constitutional "exceptions" in determining if a law has been suspended, notwithstanding the fact that these "exceptions" are just as much a part of the will of the people as are the general rules of law. Indeed, taking the majority's theory to its logical conclusion would, in effect, negate several express powers granted in the Constitution and in statutes, as they could be viewed as "exceptions" that result in the suspension of general rules of law.
Furthermore, the application of the "rule-exception sequence" inversion theory crumbles under its own weight in its struggle to justify the majority's conclusion that the Executive Order violates the Suspension Clause. Even considering only the general rule of law created by the majority, the Executive Order, as a factual matter, does not reframe the Disenfranchisement Clause to say, "No person who has been convicted of a felony shall be disqualified to vote unless the convicted felon is incarcerated or serving a sentence of supervised release." (Emphasis in original.) The terms of the Executive Order are not prospective and do not prevent any felon from being disqualified from voting upon conviction. Rather, the Executive Order only restored the rights of a subset of felons, namely, those individuals previously convicted of a felony who, as of April 22, 2016, were no longer incarcerated or on supervised probation, which is approximately 206,000 of the over 450,000 felons eligible to be considered for restoration.[4]
Moreover, felons whose rights were not restored by the Executive Order, as well as newly convicted felons, continue to be disqualified upon conviction unless the Governor or other appropriate authority acts to restore their rights. Indeed, if the Executive Order was, in fact, a suspension of the Disenfranchisement Clause, there would be no need for the Governor to enter subsequent orders restoring the rights of additional felons. When Governor McAuliffe's term is over, the new governor will have the discretion to decide whether to restore the rights of subsequent felons disqualified from voting upon conviction as required by the Disenfranchisement Clause. Thus, it is apparent that the Executive Order clearly did not actually reframe the Disenfranchisement Clause as asserted by the majority, nor does it suspend operation of that constitutional provision.
B. The Disenfranchisement Clause and the Restoration Clause Control
In my opinion, the Disenfranchisement Clause and the Restoration Clause are unambiguous and should control in this case. See Blount , 291 Va. at 205, 782 S.E.2d at 155 (determining that the Restoration Clause is "unambiguous"). As we have repeatedly stated, "the plain, obvious, and rational meaning of a statute is to be preferred over any curious, narrow, or strained construction, and a statute should never be construed in a way that leads to absurd results." Ricks v. Commonwealth , 290 Va. 470, 477, 778 S.E.2d 332, 335 (2015) (citation, alteration and internal quotation marks omitted).
Despite the majority's extensive discussion of the fact that no prior governor previously entered a categorical order regarding the restoration of political disabilities consequent upon conviction, the practice of prior governors is not dispositive of the Governor's constitutional *737 authority, or lack thereof, to issue such an order. Indeed, this Court was recently faced with a similar long-running historical practice in Blount . There we explained that the fact that, for 143 years, governors of Virginia had regularly issued "commutations" of non-capital offenses was not evidence of the governor's power to issue commutations because "the question ... is not one of practice ... rather it is one of constitutional interpretation." 291 Va. at 210, 782 S.E.2d at 158. The same holds true in the present case. Furthermore, where there are no limits on a power elsewhere in the Constitution, that power cannot be lost "because of non-use." See Bowsher v. Synar , 478 U.S. 714, 727 n.5, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986). Thus, the proper focus of this Court's analysis should be on interpretation of the Constitution of Virginia, regardless of how the Governor's power to restore political disabilities may have been exercised in the past.
"[W]hen an act is adopted in the manner prescribed by and pursuant to the authority of a specifically drawn section of the Constitution, its validity is unassailable upon the grounds of unconstitutionality under the more general provisions of other sections of the Constitution." Miller , 213 Va. at 267, 191 S.E.2d at 273. Under the Restoration Clause, some of the Governor's executive powers of clemency are expressly limited. For example, the Governor is only permitted to remit fines and penalties "under such rules and regulations as may be prescribed by law." Va. Const. art. V, § 12. The Governor only has the power to grant reprieves and pardons "after conviction." Id. Also, the Governor cannot grant reprieves and pardons "when the prosecution has been carried on by the House of Delegates." Id. Obviously, the framers of the Constitution clearly knew how to limit the Governor's clemency powers, and they did so within the relevant clauses of this section. Tellingly, the Constitution is silent with regard to limitations on the Governor's power "to remove political disabilities consequent upon conviction," and certainly the Constitution includes no words of limitation with regard to the manner in which the Governor might exercise that power, whether it be on an individual basis or a categorical one.
The second paragraph of the Restoration Clause reinforces the absence of any prohibition on the Governor removing political disabilities in a blanket order. That paragraph imposes a reporting obligation on the Governor with respect to certain clemency powers. The Governor is required to communicate to the General Assembly, at each regular session, the "particulars of every case of fine or penalty remitted, of reprieve or pardon granted, and of punishment commuted," with his reasons for doing so. Id. No such reporting requirement is imposed on the Governor with respect to his power to remove political disabilities. Thus, even if this second paragraph could be read to imply that the Governor could only exercise his clemency powers in individualized orders as opposed to blanket orders, this potential limitation does not apply to the Governor's power to remove political disabilities. As we have previously held, the power to remove political disabilities for convicted felons "remains vested solely in the Governor, who may grant or deny any request without explanation, and there is no right of appeal from the Governor's decision." In re Phillips , 265 Va. at 87-88, 574 S.E.2d at 273.
I believe that the majority's consideration of the textual inferences to be drawn from the Restoration Clause is flawed, because it fails to adequately consider the history of the clemency provisions which concern the restoration of political disabilities by the Governor. A more complete consideration of that history indicates that, despite Virginia's historical distrust of executive power, its citizens purposefully granted the Governor textually unrestricted constitutional authority to remove political disabilities consequent upon conviction, perhaps in consideration of the potential disenfranchisement and exclusion from government of former Confederates.[5]
*739 However, the reason why they did it is irrelevant, the will of the people as expressed in the text of the Constitution of Virginia should be enforced.
In the absence of textual limitations specifying the manner in which constitutional powers must be exercised, this Court has recognized that the Governor has broad discretion to exercise his constitutional powers, even if his decisions create arguably undesirable results. See Allen v. Byrd , 151 Va. 21, 25-27, 144 S.E. 469, 470 (1928) (the Governor's power to fill vacancies on this Court temporarily, like his power to remit fines and penalties, is an executive discretionary function that he is not constrained from exercising); Blair v. Commonwealth , 66 Va. 850, 862-63 (1874) ("Is it not reasonable to suppose that the framers of the constitution, while they were enlarging the executive powers of pardon, and freeing it from the control of the legislature, intended to invest the governor with discretion in such a case?").
Petitioners assert that the limitations are found when the Restoration Clause is read in conjunction with the Disenfranchisement Clause. According to petitioners, because the Disenfranchisement Clause refers to an individual whose rights have been restored, namely as "his," that indicates that restoration of political disabilities can only be restored on an individual basis. This clause, however, has nothing to do with the Governor's clemency powers. Instead, it governs the qualifications necessary for individual voters in Virginia. Under the Disenfranchisement Clause, a person convicted of a felony cannot vote in Virginia unless "his civil rights" have been restored; nothing in this clause indicates that such a restoration can only occur on an individual basis. The Disenfranchisement Clause merely states the requirement imposed on each person who has been convicted of a felony who seeks to become a qualified voter. Indeed, if we were to apply petitioners' interpretation, the Governor would not be able to restore the rights of women or of multiple persons. Our interpretation of this clause is aided by the long-settled canon of construction that "[i]n the absence if a contrary indication, the masculine includes the feminine (and vice versa) and the singular includes the plural (and vice versa)." Antonin Scalia & Bryan A. Garner, *740 Reading Law: The Interpretation of Legal Texts 129 (2012) (App. 250). See also Code § 1-216 ("A word used in the masculine includes the feminine and neuter."); Code § 1-227 ("A word used in the singular includes the plural and a word used in the plural includes the singular.").
It is further worth noting that individuals in Virginia have previously had their political disabilities restored in categorical orders, as opposed to on an individualized basis, by "other appropriate authorities." That phrase has been interpreted to include the President of the United States and other governors or pardoning boards with such authority. These "other appropriate authorities" have restored voting rights or otherwise granted clemency on a class-wide basis. See Va. Op. Att'y Gen. 99-087, 1999 Va. AG LEXIS 50 (Aug. 3, 1999); Ky. Exec. Order No. 2015 -871 (Nov. 24, 2015), available at http://apps.sos.ky.gov/Executive/Journal/execjournalimages/2015-MISC-2015-0871-242277.pdf (last visited July 21, 2016) (restoring political disabilities to felons); Iowa Exec. Order No. 42 (July 4, 2005), available at http://publications.iowa.gov/3762/1/EO_42.pdf (last visited July 21, 2016) (restoring rights of citizenship to offenders who had completed their sentences).
I believe that the plain language of the Disenfranchisement Clause is unambiguous and places no limitations on the Governor's power to remove political disabilities. The Disenfranchisement Clause simply requires that, in order to be qualified to vote, a person who has been convicted of a felony must have had his or her civil rights "restored by the Governor or other appropriate authority." This clause in no way dictates the manner in which restoration by the Governor or "other appropriate authority" must occur.
III. Conclusion
In my opinion the petitioners lack standing in the present case. Furthermore, even if the petitioners were able to demonstrate standing, nothing in the Constitution of Virginia renders the manner in which the Governor exercised his authority in this Executive Order and the subsequent similar orders unconstitutional. In exercising his power to remove political disabilities through the Executive Order and subsequent similar orders, the Governor neither reframed the Disenfranchisement Clause nor suspended its operation. Indeed, the Disenfranchisement Clause does not implicate the manner in which the Governor may exercise his clemency powers under the Restoration Clause. Accordingly, I would hold that the Governor's Executive Order and subsequent similar orders do not violate the Constitution of Virginia and, therefore, I would deny the writs of mandamus and prohibition.

The inquiry into "the characteristics of the person," however, must be blind to the status of the litigant in the public arena. In this instance, Speaker Howell and Majority Leader Norment are due great respect and appreciation for their public service. Yet for the purpose of this analysis they stand before the bar of the Court in a different yet equally respected capacity, as citizens and voters.

The majority states that Goldman is a case of taxpayer standing rather than voter standing, and that Wilkins, which was decided subsequently, did not cite Goldman. Both statements are true, but neither is relevant to this analysis. The fundamental principle in Goldman is that citizens seeking mandamus relief against the Commonwealth must show "a direct interest ... in the outcome of the controversy that is separate and distinct from the interest of the public at large." Goldman, 262 Va. at 373, 552 S.E.2d at 72. Wilkins does not eliminate this requirement for voters; in fact, it also requires a voter to show a "particularized" or "individualized" injury, unless the Court can infer the voter has been subjected to unequal treatment based on his or her residence in an affected district. 264 Va. at 459-60, 571 S.E.2d at 107. In short, the voter must be able to distinguish himself or herself from other voters.

See 1874 Acts ch. 158. Today, Code § 24.2-431 confers standing upon "any three qualified voters" for the purpose of challenging "the registration of any person whose name is on the registration records for their county or city" by filing a petition in circuit court. In so doing, the General Assembly eliminated the need for "any three qualified voters" to demonstrate an injury particularized to them.

The parties direct our attention to a number of federal cases, including Michel v. Anderson, 14 F.3d 623 (D.C. Cir. 1994) and Raines v. Byrd, 521 U.S. 811, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997). However, as the majority correctly notes, Virginia law governs this case. Therefore, following the majority's lead, I confine my analysis to the principles set forth in our precedents.

In Wilkins, this Court also applied these principles to the claim arising under Article II, Section 6 of the Constitution of Virginia relating to contiguity and compactness. But only those residents within the allegedly non-compact and non-contiguous districts received the benefit of an inference of representational harm. This is because the Court was able to infer an injury due to the alleged difference between various districts, and the allegedly differential treatment of the residents resulting from the variation between districts. In the present case, the petitioners have not alleged that the Executive Order impacts them differently than it impacts any other citizen of Virginia. Accordingly, we cannot infer an injury here as we could in Wilkins.

The majority takes issue with this statement. However, each Virginia case of alleged voter "packing" has involved a claim that the relevant population was malapportioned such that one district was overpopulated and under-represented relative to other districts. See, e.g., Wilkins v. Davis, 205 Va. 803, 139 S.E.2d 849 (1965) ; Davis v. Dusch, 205 Va. 676, 139 S.E.2d 25 (1964) ; Brown v. Saunders, 159 Va. 28, 166 S.E. 105 (1932). A search of federal authority regarding "packing" reveals this general definition from a plurality of the Supreme Court of the United States: " 'packing' refers to the practice of filling a district with a supermajority of a given group or party." Vieth v. Jubelirer, 541 U.S. 267, 287 n.7, 124 S.Ct. 1769, 158 L.Ed.2d 546 (2004) (plurality opinion); see also Hunt v. Shaw, 517 U.S. 899, 917, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996) (describing the right to cast "an undiluted vote," in the context of the Voting Rights Act, as the right "to cast a ballot equal among voters"); Voinovich v. Quilter, 507 U.S. 146, 154, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993) (describing "packing" as "the concentration of blacks into districts where they constitute an excessive majority").

None of the cases cited by the majority that "assume [ ]" standing are analogous to the one at hand. Supra at 8 n. 4, 788 S.E.2d at 713 n. 4. As noted above, each of the cases cited by the majority involved claims that certain districts received disproportionate representation relative to population, thereby rendering the votes of those in packed districts less effective vis-à -vis the votes of registered voters in lesser-populated districts.
In Wilkins, 205 Va. 803, 139 S.E.2d 849, the petitioner was a resident of the then Second Congressional District, which he alleged was overpopulated and under-represented as a result. Brief for the Petitioner at 1-2. Although the Court did not discuss the issue of standing, the petitioner's residence gave him an interest "separate and distinct" from that of the public at large in the reapportionment of the district at issue.
Similarly, in Davis, 205 Va. 676, 139 S.E.2d 25, the petitioners were residents of city boroughs that were allegedly under-represented on the basis of population. The petitioners also alleged a statutory right to reapportionment enforceable by mandamus pursuant to former Code §§ 15.1-803 and 15.1-807. Id. at 680-81, 139 S.E.2d at 27-28.
Finally, in Brown, 159 Va. 28, 166 S.E. 105, the petitioner sought a writ of mandamus directing the Secretary of the Commonwealth to place him on the ballot as a candidate at large for a seat in the House of Representatives. The Secretary had refused to recognize his candidacy because such elections were conducted on a district-by-district basis. In response, the petitioner argued that he had satisfied the requirements of former Code § 154 (1930), which set forth the requirements for declaring a candidacy, and that he had a right to contest the election as a candidate at large because the congressional districts were invalid under then Section 55 of the Constitution of Virginia, which required districts to have "as near as practicable an equal number of inhabitants." In short, the petitioner alleged a statutory right to contest the election and sought mandamus to enforce that statutory right. Id. at 31-32, 166 S.E. at 105-06.

During oral argument, counsel for the petitioners represented to the Court that their primary argument for standing was premised on their status as voters. However, in their petition, the petitioners have asserted two alternative theories of standing: (1) Senator Norment asserts standing in his capacity as a candidate for re-election in 2019, and (2) Senator Norment and Speaker Howell assert standing in their capacity as members of the General Assembly. The theory of "candidate standing" is based on competitor standing in the market context and standing derived from procedural injuries in the administrative context. However, the petitioners have not yet been able to provide evidence, including facts indicating that the addition of voters will impact Senator Norment's re-election campaign.

To date, the petitioners have been unable to gather potentially relevant information regarding the individuals whose voting rights have been restored because the Governor has refused to provide the database. This obstacle cannot stand in the face of a Rule 5:7(d) order.

Though the majority does not decide whether Speaker Howell and Senator Norment have standing as legislators, I note that neither of them would have standing as legislators to challenge Governor McAuliffe's Executive Order. See Raines v. Byrd, 521 U.S. 811, 829, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997) ("[A]ppellees have alleged no injury to themselves as individuals ..., the institutional injury they allege is wholly abstract and widely dispersed ..., and their attempt to litigate this dispute at this time and in this form is contrary to historical experience. We attach some importance to the fact that appellees have not been authorized to represent their respective Houses of Congress in this action, and indeed both Houses actively oppose their suit.").
The majority also does not determine whether Senator Norment has standing as a 2019 legislative candidate. As a potential future candidate, Senator Norment has alleged no competitive injuries and only a "remote or indirect interest" in the electorate. Thus, he does not have standing to challenge the Executive Order. Nicholas v. Lawrence, 161 Va. 589, 593, 171 S.E.2d 673, 674, 171 S.E. 673 (1933) ; see also Wittman v. Personhuballah, 578 U.S. ----, ----, 136 S.Ct. 1732, 1737, 195 L.Ed.2d 37 (2016) (incumbent legislators only alleged a "nonobvious harm," that their chances at reelection were hindered, which was insufficient to confer standing in their challenge of the redistricting plan).

Article I, Section 7 is referred to as "the Suspension Clause" in the petitioners' briefs and I will refer to it likewise. (Petitioners' Br. at 32).

In a somewhat related context, this Court has declined to impose restrictions on the Governor's power where none exist. See Blair, 66 Va. (25 Gratt.) at 861-62 (holding Governor could grant a pre-sentencing pardon and relying in part on the rationale that there was no practical difference between a pre-sentencing and post-sentencing pardon); see also Lee v. Murphy, 63 Va. 789, 797 1872 (holding the Governor's power to grant pardons, which was not otherwise restricted by the Constitution of Virginia, included the power to grant conditional pardons).

See Respondent's Br. p. 4 (citing Christopher Uggen, Sarah Shannon, & Jeff Manza, State-Level Estimates of Felon Disenfranchisement in the United States 2010, available at https://www.kftc.org/sites/default/files/docs/resources/fd_state_level_estimates_of_felon_disen_2010.pdf (last visited July 21, 2016) (report for the Sentencing Project, a national nonprofit organization engaged in research and advocacy on criminal justice issues)).

As noted by the majority, the Constitution of Virginia initially circumscribed the clemency power of the Governor. In 1776, the Constitution of Virginia required the Governor to first consult with the Council of State before issuing a pardon and forbade any executive pardon contrary to laws enacted by the legislature. Va. Const. § 9 (1776). The Constitution of Virginia later imposed a reporting requirement. See Va. Const. art. V, § 12.
However, ratification of the 1870 Constitution occasioned significant and enduring reorientation of the Governor's constitutional clemency powers. The drafters of the 1870 Constitution began crafting that document in December 1867. (Only the debates of the Constitutional Convention between December 3, 1867 and January 29, 1868 were recorded "verbatim" in "The Debates and Proceedings of the Constitutional Convention of the State of Virginia" ("Convention Debates"), available at http://hdl.handle.net/2027/hvd.li14pl (last visited July 22, 2016). A less detailed account of the entire convention is available in a "Journal of the Constitutional Convention of the State of Virginia" ("Convention Journal"), available at http://hdl.handle.net/2027/umn.319510024615024 (last visited July 22, 2016). Documents the delegates chose to print are compiled in "Documents of the Constitutional Convention of the State of Virginia" ("Convention Documents"), available at http://hdl.handle.net/2027/hvd.li14pj (last visited July 22, 2016). Each is available at https://www.hathitrust.org/.). Under the governance of the Reconstruction Act of 1867, the constitutional convention lasted approximately four months, and among the chief concerns was the political participation of African-Americans and the potential disenfranchisement and exclusion from government of former Confederates. See 1 A.E. Dick Howard, Commentaries on the Constitution of Virginia 329 (1974); see also John Dinan, The Virginia State Constitution: A Reference Guide 13 (G. Alan Tarr ed., 2006) (explaining the sharp disagreement over the role African-Americans were to play in post-Civil War government).
It was questioned relatively early in the debates whether the Governor should have the authority to remove political disabilities from those who receive "executive clemency, when, in [the Governor's] opinion, the facts of the case warrant such a course." See Convention Documents at 129 (January 16, 1868 Report of The Committee on the Pardoning Power). Although the Committee on the Pardoning Power recommended against granting the Governor such power because he might abuse it, the issue was tabled on January 17, 1868, without meaningful debate. See id. at 129; Convention Debates at 150, 483-84.
The actual constitutional language defining the Governor's powers was not discussed in earnest and finalized until the debates of February 3, 1868 through February 9, 1868. See Convention Journal at 139-69. When the Committee on the Executive Department of Government submitted its recommendations for the portion of the Constitution of Virginia defining the Governor's clemency powers, it proposed retaining legislative control over the granting of reprieves and pardons and did not mention a separate power to remove political disabilities. See Convention Documents at 141-44; Convention Journal at 102.
However, during debate, a delegate recommended the Governor have the power "to remove political disabilities consequent upon conviction." See Convention Journal at 146. Interestingly, this language was proposed by the same delegate, Edgar Allan, who requested the Committee on the Pardoning Power report on whether the Governor should have the power to remove political disabilities. See Convention Debates at 150. After discussing the matter, another delegate suggested seemingly broader language that the Governor "have the power ... to remove political disabilities consequent upon conviction for offenses committed prior, or subsequent to, the adoption of this Constitution." See Convention Journal at 149; see also Ex parte Grossman, 267 U.S. 87, 117, 45 S.Ct. 332, 69 L.Ed. 527 (1925) (explaining that "the term 'offences' is used in the Constitution in a more comprehensive sense than are the terms 'crimes' and 'criminal prosecutions' "). Another delegate then proposed the Constitution of Virginia qualify that "no pardon shall have the effect of removing such disabilities except in cases wherein the party has been, or may be, improperly convicted, or the commission of the offense was attended by strong mitigating circumstances." See Convention Journal at 149. The convention rejected the proffered limit on the effect of a pardon and agreed the Governor should be able to remove political disabilities.
Further expanding the Governor's clemency powers, a delegate then successfully proposed removing language that, in all previous constitutions, had specifically permitted legislative control over the Governor's power to grant reprieves and pardons. See Convention Documents at 141 (proposing the Governor shall have the power to "grant reprieves and pardons after conviction" except in prosecutions carried out by the House of Delegates "or [when] the law shall otherwise particularly direct"); Convention Journal at 150 (removing "or [when] the law shall otherwise particularly direct"); see also 10 William F. Swindler, Sources & Documents of United States Constitutions Virginia, Washington, West Virginia, Wisconsin, Wyoming 54, 64, 83, 104 (1979) (reprinting the 1776, 1829, 1851, 1864, and 1870 Constitutions). Compare Convention Documents at 288 (The Report of The Committee of Revision on the Reports of the Standing Committees, which appears to incorporate amendments to the Standing Committees' initial proposals of constitutional language), with Swindler, supra at 119 (reprinting the 1870 Constitution, which included verbatim language defining the Governor's clemency powers as reported by The Committee of Revision). Accordingly, it appears the convention sought to expand and unleash the Governor's clemency powers, despite being amply warned that the Governor might use those powers categorically or for ill ends. See Blair, 66 Va. (25 Gratt.) at 859-60 (noting the executive pardon power was freed from legislative control in the 1870 Constitution and extended to "a new and important subject," the power to remove political disabilities).
It appears the drafters of the 1870 Constitution knew how to limit the Governor's exercise of his restoration power had they intended to do so. See City of Va. Beach v. International Family Entm't, 263 Va. 501, 507, 561 S.E.2d 696, 700 (2002) (noting that, had the General Assembly intended to legislate a certain result, it certainly knew how to do so because it had codified a similar result in other legislation). As noted above, previous constitutional conventions were not shy about explicitly limiting the Governor's clemency powers, and the 1870 Constitution retained some of those limits. Even more telling it seems, the 1870 Constitution as proposed to Virginians for ratification, included two provisions intended to exclude former Confederates from voting and from political office. See Armistead R. Long, The Constitution of Virginia: An Annotated Edition 22-23, 26-27 (1901) (describing the disenfranchisement and "test oath" clauses that were ultimately rejected by Virginia citizens when ratifying the 1870 Constitution). The provisions contained language that, respectively, allowed "the legislature may, by a vote of three-fifths of both houses, remove the political disabilities incurred by this clause from any person included therein by a separate vote in each case" and "[t]he disabilities [here]in contained may be individually removed by a three fifths vote of the general assembly." See id.; Swindler, supra at 117-18. Although Virginians ultimately rejected both provisions, they appear to confirm the drafters understood the difference between restoration of rights en masse and restoration on an individual basis and did not intend to limit the Governor to the latter.
Of note, shortly after ratification of the 1870 Constitution, the U.S. Supreme Court repeatedly determined the President could use his pardon power to forgive groups of individuals. See Knote v. United States, 95 U.S. 149, 152-53, 24 L.Ed. 442 (1877) (explaining that presidential forgiveness operated identically whether extended through individual pardon or amnesty to "whole classes or communities"); United States v. Klein, 80 U.S. 128, 139-42, 13 Wall. 128, 20 L.Ed. 519 (1872) (intimating the President did not need statutory authority to grant general pardons or amnesty in the wake of the Civil War); see also Armstrong v. United States, 80 U.S. 154, 155-56, 13 Wall. 154, 20 L.Ed. 614 (1972) (implicitly recognizing validity of President Andrew Johnson's December 25, 1868 general pardon). Notwithstanding, the wording of the Constitution of Virginia, which does not require that restoration be done on an individual basis, has endured two constitutional conventions since 1870. See Swindler, supra at 161 (providing the 1902 Constitution); Va. Const. art. V, § 12 ; see also Lewis v. Whittle, 77 Va. 415, 421 (1883) ("[I]t is safer to consider that such words as are used are those intended to be used, and such words as are not used were not intended to be used.").